# IN THE SUPREME COURT OF IOWA

No. 15–0624

Filed June 24, 2016

**STATE OF IOWA,**

Appellee,

vs.

**JOHN ARTHUR SENN JR.,**

Appellant.

---

Appeal from the Iowa District Court for Polk County, Kevin A. Parker and Gregory D. Brandt, District Associate Judges.

Defendant challenges the constitutionality of Iowa Code section 804.20, contending a right to counsel attached under article I, section 10 of the Iowa Constitution before criminal charges were filed, which entitled him to a private phone call with counsel before deciding whether to submit to a chemical breath test. **DISTRICT COURT JUDGMENT AFFIRMED.**

Brandon Brown and Tammy Westhoff Gentry of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, John P. Sarcone, County Attorney, and Maurice Curry, Assistant County Attorney, for appellee.

**WATERMAN, Justice.**

Iowa Code section 804.20 (2013) provides a limited statutory right to counsel that allows persons who have been arrested to make phone calls to lawyers or family members and to meet alone and in private with their lawyer at the place of detention. While the statute allows private in-person consultations, it permits the police officer or jailer to be present for the detainee's phone calls. We must decide whether this statute is unconstitutional as applied to a person arrested, but not yet formally charged, for operating a motor vehicle while intoxicated (OWI) who wants to speak privately by phone with a lawyer before deciding whether to submit to a chemical breath test.

The defendant in this case, detained for suspicion of drunk driving, was at the police station on the phone with a lawyer getting advice regarding the implied-consent procedure[1] and his time-sensitive decision whether to refuse the breathalyzer test. The arresting officer declined the defendant's request for privacy during the phone call but told the defendant he could have privacy if the lawyer came to the station. No lawyer arrived in time, and the defendant submitted to the test, which showed his blood alcohol level at .140. Eleven days later, the State charged him with OWI, and he moved to suppress the test result, claiming he was entitled under article I, section 10 of the Iowa Constitution to a private phone consultation with counsel before

---

[1]*See* Iowa Code § 321J.6 ("A person who operates a motor vehicle in this state under circumstances which give reasonable grounds to believe that the person has been operating a motor vehicle [while intoxicated] is deemed to have given consent to the withdrawal of specimens of the person's blood, breath, or urine and to a chemical test or tests of the specimens for the purpose of determining the alcohol concentration or presence of a controlled substance or other drugs . . . .").

chemical testing. The district court disagreed, and he was convicted. We retained his appeal.

For the reasons explained below, we conclude that the right to counsel under the Iowa Constitution, as under the Sixth Amendment to the United States Constitution, does not attach until formal criminal charges are filed and had not attached at the time this defendant was asked to submit to the chemical breath test. Most other state supreme court decisions are in accord. Because no Iowa or federal constitutional right to counsel was violated and the defendant's limited statutory right to counsel was honored, we affirm the district court's judgment of conviction.

## I. Background Facts and Proceedings.

In the early morning hours of Labor Day, September 1, 2014, Officer Brian Cuppy was on patrol in downtown Des Moines when he saw a truck eastbound on Court Avenue stop for a red light in the middle of the intersection with Water Street with its "back tires . . . more than five feet past the cross walk." Officer Cuppy followed the truck, activated his police cruiser's flashing lights, and initiated a traffic stop nearby. The driver, John Arthur Senn Jr., age twenty-nine, told Officer Cuppy that he did not realize he had stopped in the middle of the intersection. Officer Cuppy noted that Senn had bloodshot watery eyes, slurred speech, and a "staggered gait" and smelled of alcohol. Senn initially denied that he had been drinking that night. Officer Cuppy administered field sobriety tests, which Senn failed. Senn then admitted that he had been drinking but said he had stopped over twenty minutes earlier. Senn took a preliminary breath test, which showed an alcohol concentration of 0.165, more than double the legal limit. Senn was arrested for failing to obey

the traffic control signal and for operating while intoxicated and transported to the Des Moines metro police station for chemical testing.

Around 2:30 a.m., Officer Cuppy led Senn to the DataMaster testing room and gave Senn a copy of the implied-consent advisory. Senn read the consent. Officer Cuppy then read the advisory aloud to Senn. Officer Cuppy asked if he had any questions, and Senn replied, "No sir." Officer Cuppy then read Senn his statutory rights under Iowa Code section 804.20. At 2:34 a.m., Officer Cuppy requested a breath specimen.

Senn asked to call a lawyer. Officer Cuppy remained in the room while Senn made phone calls. Senn had trouble contacting counsel. Officer Cuppy offered to let Senn use the phone book. Senn declined. Around 2:46 a.m., Officer Cuppy asked if Senn was trying to call a lawyer and offered the phone book again. Senn explained he had a lawyer, but she had not answered her after-hours phone number. Senn eventually reached an attorney at 2:49 a.m. Senn, in Officer Cuppy's presence, told the attorney on the phone he was being investigated for his "second first" OWI. Senn explained that his first OWI was "relinquished at the state's expense" in 2009 or 2010. Senn answered the attorney's questions. Senn then asked Officer Cuppy for "attorney–client privilege please." Officer Cuppy responded that he could not have attorney–client privilege while on the phone but that he could if the attorney came to the jail. Senn repeated that comment to his attorney. Officer Cuppy explained that Senn could not be left alone with the phone. Senn then asked Officer Cuppy if he could have a family member visit. Officer Cuppy said yes, "as long as they are here in time."

Senn asked Officer Cuppy why he was stopped. Officer Cuppy replied it was because he ran a red light. Senn told the attorney that he

"did not run a red light." Senn explained to the attorney that he worked as an electrician, so his license was "imperative" to his work. Officer Cuppy gave Senn a pen and paper to take notes while he was on the phone. Senn described his criminal record. Senn asked the attorney to come to the police station and said he was able to pay for the trip. Senn offered to pay because he "wanted to make sure he was taken care of." Officer Cuppy then said Senn had thirty-two minutes left for private consultation. Senn said he understood the consequences of his choice to take or refuse the breathalyzer. Officer Cuppy told Senn this would be his second revocation. Senn again offered to hire the attorney. Senn asked Officer Cuppy what time he had been stopped, and Officer Cuppy replied it had been 2:04 a.m. While Senn was on the phone, he said,

> I'd like to expunge any legal options I have at this point because I was downtown on a good faith gesture picking up a friend, so it's not like I was being—obviously I was legally intoxicated, but . . . . I'm just saying that, yeah.

The attorney was unable to meet with Senn in person. Senn asked the attorney if he should wait for someone from the firm to come, call a family member, or do something else. Senn asked for attorney references, and she gave him some. Their conversation ended at 3:17 a.m. Senn then tried to call the recommended attorneys and left messages.

Officer Cuppy escorted Senn to the restroom upon his request. When Senn returned, he called another lawyer and asked Officer Cuppy for a glass of water. Officer Cuppy explained he could not have any water until he decided whether he would take the breath test. Senn left two more voice mails explaining his situation and asking for legal help. Officer Cuppy told Senn that because of his prior license revocation, this time his license would be suspended for one year if he failed the test and

it would be suspended for two years if he refused to take the test.[2]  Senn called a friend to let him know he would be booked soon.  He expressed frustration about not being able to get an attorney to come to the station.  He said he was willing to pay $5000 but no one was willing to come.  He was afraid of losing his job.  He said he was "playing for the good team" and hoped the officer would let him go.  At 3:39 a.m., Officer Cuppy told Senn he had to make a decision.  Senn consented to take the breathalyzer test.  At 3:41 a.m., Senn took the test, and his blood alcohol content was 0.140.

Officer Cuppy submitted a complaint to the county attorney, and it was approved at 6:14 a.m.  Eleven days later, on September 12, Senn was charged by trial information with operating while intoxicated in violation of Iowa Code section 321J.2, a serious misdemeanor.  On November 20, Senn filed a motion to suppress, contesting the legality of the stop, the officer's compliance with section 804.20, and the interference with his right to counsel under article I, section 10 of the Iowa Constitution.  Senn argued the phrase "in cases involving the life, or liberty of an individual," which does not appear in the Sixth Amendment, showed the Iowa framers' intent to provide a broader right to counsel.  Senn argued an implied-consent procedure is a critical stage of the prosecution under the Iowa Constitution because it involves a choice that has significant consequences for criminal liability.

The district court held a suppression hearing on December 5.  At the hearing, Senn's counsel narrowed his motion to the right to counsel

---

[2]*See* Iowa Code §§ 321J.9(1)(*b*), .12(1)(*b*).

under the Iowa Constitution.[3] Senn testified that when he called his attorney, she advised him to assert his attorney–client privilege. Senn did, but Officer Cuppy continued to listen to his side of the phone conversation. Senn admitted on cross-examination that the police officer told him that he could not have a confidential phone call but that the attorney could come in person and speak privately with Senn at the station. He agreed that Officer Cuppy never interrupted the phone call.

On December 10, the district court denied Senn's motion to suppress. The ruling stated,

> All of the evidence that the defendant wishes to suppress on constitutional grounds was obtained before Senn was charged with the offense. The Iowa Constitutional provision is similar to the U.S. Constitution. This court finds that the phrase "life or liberty" deals with contempt situations such as child support, civil infractions or Chapter 229 and Chapter 229A. Therefore, Section 10 does not apply in this matter and will not provide a basis for excluding any of the evidence. . . .
>
> Further a request to perform field sobriety tests and the request to submit to blood tests (includes breath testing) are not interrogation. Questions normally attendant to arrest and custody do not constitute interrogation.
>
> *State v. Hellstern,* [856] N.W.2d [355] (Iowa 2014) controls in this matter. The Defendant limited his argument to only the constitutional issue. Therefore, this court will not address the 804.20 issue.

(Citations omitted.) Following the denial of his motion, Senn waived jury trial and was convicted on the minutes of testimony. He was fined $1250 plus surcharges and court costs and incarcerated for one year with all but three days suspended.

We retained Senn's appeal.

---

[3]This court's decision in *State v. Hellstern*, 856 N.W.2d 355, 360–65 (Iowa 2014), which addressed Iowa Code section 804.20, was filed two weeks before the suppression hearing.

## II.  Standard of Review.

The sole issue on appeal is whether Iowa Code section 804.20, by permitting the police officer or jailer to be present while a detainee suspected of drunk driving talks by phone with a lawyer about whether to submit to chemical testing, violates the right to counsel under article I, section 10 of the Iowa Constitution.  We reiterate our well-established standard of review:

> We review constitutional challenges to a statute de novo.  In doing so, we must remember that statutes are cloaked with a presumption of constitutionality.  The challenger bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt.  Moreover, "the challenger must refute every reasonable basis upon which the statute could be found to be constitutional."  Furthermore, if the statute is capable of being construed in more than one manner, one of which is constitutional, we must adopt that construction.

*State v. Thompson,* 836 N.W.2d 470, 483 (Iowa 2013) (quoting *State v. Seering,* 701 N.W.2d 655, 661 (Iowa 2005)).

## III.  Analysis.

Senn asks us to hold for the first time that the right to counsel under article I, section 10 of the Iowa Constitution attached before the State filed criminal charges against him while he was under arrest for suspicion of drunk driving and faced with the decision of whether to submit to a chemical breath test that measures his blood alcohol level.  The State contends, and the district court ruled, that the constitutional right to counsel had not yet attached and that the arresting officer followed the governing statute by allowing Senn to speak by phone with a lawyer in the officer's presence.  The statute, Iowa Code section 804.20, states,

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without

unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. *If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained.* If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. *An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay.* A violation of this section shall constitute a simple misdemeanor.

(Emphasis added.)

Because this case arose from the invocation of implied consent, we read section 804.20 together with the implied-consent provisions of Iowa Code chapter 321J. *See State v. Walker*, 804 N.W.2d 284, 290 (Iowa 2011). Senn does not challenge the constitutionality of the implied-consent statute. "[W]e have continuously affirmed that the primary objective of the implied consent statute is the removal of dangerous and intoxicated drivers from Iowa's roadways in order to safeguard the traveling public." *Id.* (quoting *Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 594 (Iowa 2011)); *see also Birchfield v. North Dakota*, 579 U.S. ___, ___, ___ S. Ct. ___, ___, ___ L. Ed. 2d ___, ___ (2016) ("Drunk drivers take a grisly toll on the Nation's roads, claiming thousands of lives, injuring many more victims, and inflicting billions of dollars in property damage every year. To fight this problem, all States have laws that prohibit motorists from driving with a blood alcohol concentration (BAC) that exceeds a specified level."); *State v. Garcia*, 756 N.W.2d 216, 220 (Iowa 2008) (stating that Iowa's implied-consent law "was enacted to help reduce the appalling number of highway deaths resulting in part at least from intoxicated drivers" (quoting *State v. Wallin*, 195 N.W.2d 95, 96 (Iowa 1972)); *State v. Comried*, 693 N.W.2d 773, 775 (Iowa 2005) ("We

have said the purpose of chapter 321J is 'to reduce the holocaust on our highways[,] part of which is due to the driver who imbibes too freely of intoxicating liquor.' " (Quoting *State v. Kelly*, 430 N.W.2d 427, 429 (Iowa 1988).)).   But section 804.20 applies to all arrestees, not just drunk drivers.  *Walker*, 804 N.W.2d at 290.  Accordingly, this appeal has far-reaching implications.

Section 804.20 provides "a limited statutory right to counsel before making the important decision to take or refuse the chemical test under implied consent procedures."  *Hellstern*, 856 N.W.2d at 361 (quoting *State v. Vietor*, 261 N.W.2d 828, 831 (Iowa 1978)).  Senn argues that the provision in section 804.20 allowing the officer to be present for the defendant's phone call with a lawyer is unconstitutional because he was entitled under article I, section 10 to a *private* telephone consultation with his lawyer.  We did not reach that constitutional argument in *Hellstern.  Id.* at 365.  In *Vietor*, we rejected the argument that the right to counsel under the Sixth Amendment had attached when the arrestee was asked to submit to the breathalyzer test.  261 N.W.2d at 830.  In *Walker*, we reiterated that the "Sixth Amendment right to counsel had not yet attached at the time [the detainee] was asked to perform the breath test."  804 N.W.2d at 293.  We have also held the right to counsel under the Iowa and Federal Constitutions does not apply to chemical testing under administrative implied-consent procedures for revoking drivers' licenses.  *Swenumson v. Iowa Dep't of Pub. Safety*, 210 N.W.2d 660, 662 (Iowa 1973).

**A. Constitutional Construction and Relevant Iowa Caselaw.** Article I, section 10 is entitled "Rights of persons accused."  It contains

two clauses that do not appear in the Sixth Amendment,[4] which are italicized below:

> In all criminal prosecutions, *and in cases involving the life, or liberty of an individual* the accused shall have a right to a speedy and public trial by an impartial jury; to be informed of the accusation against him*, to have a copy of the same when demanded*; to be confronted with the witnesses against him; to have compulsory process for his witnesses; and, to have the assistance of counsel.

Iowa Const. art. I, § 10 (emphasis added). In *State v. Young*, we relied on the textual differences between the state and federal provisions to hold that the right to counsel under article I, section 10 applies to misdemeanor charges with the possibility of imprisonment. 863 N.W.2d 249, 256–57, 281 (Iowa 2015). But we have never held the right to counsel under the Iowa Constitution attaches before the filing of formal criminal charges.

To the contrary, we have held the right to counsel under both the State and Federal Constitutions "attaches at or after the initiation of adversary proceedings against the defendant, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *State v. Hensley*, 534 N.W.2d 379, 382 (Iowa 1995). When deciding at what stage in a case the right to counsel attaches, "[w]e interpret the Iowa constitutional provision the same as the Sixth Amendment." *Id.* at

---

[4]The Sixth Amendment to the United States Constitution, entitled "Jury trials for crimes, and procedural rights," states,

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

382 n.3; *see also State v. Wing*, 791 N.W.2d 243, 254 (Iowa 2010) (Cady, J., dissenting) ("Th[e] reading is the same for the right to a speedy trial under both the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution because the operative language of the two provisions is the same.");[5] *State v. Majeres*, 722 N.W.2d 179, 182 (Iowa 2006) ("Iowa's right-to-counsel guarantee affords no greater protection than the federal constitution . . . .").

We begin our constitutional analysis with familiar principles of interpretation:

> First and foremost, we give the words used by the framers their natural and commonly-understood meaning. However, we may also examine the constitutional history and consider the object to be attained or the evil to be remedied as disclosed by the circumstances at the time of adoption.

*Star Equip., Ltd. v. Iowa Dep't of Transp.*, 843 N.W.2d 446, 457–58 (Iowa 2014) (quoting *State v. Briggs,* 666 N.W.2d 573, 578 (Iowa 2003)). Our goal in state constitutional interpretation "is to ascertain the intent of the framers." *Homan v. Branstad*, 812 N.W.2d 623, 629 (Iowa 2012) (quoting *Rants v. Vilsack*, 684 N.W.2d 193, 199 (Iowa 2004)).

We begin with the plain meaning of the words of article I, section 10, which by its terms applies to "criminal prosecutions" and in "cases involving the life, or liberty of an individual." Section 10 expressly provides "the accused" with eight enumerated rights: (1) a speedy trial, (2) a public trial, (3) a trial by an impartial jury, (4) to be informed of the accusation; (5) to obtain a copy of the accusation, (6) to confront witnesses, (7) to have compulsory process for the accused's witnesses,

---

[5]The majority in *Wing* decided the case based on an interpretation of the speedy indictment rule and corresponding statutes. *Wing*, 791 N.W.2d at 246, 249. The majority noted the state and federal constitutional underpinnings of the speedy indictment rule but did not rely on constitutional provisions to decide the case. *See id.*

and (8) to have the assistance of counsel. The first seven of these enumerated rights make sense only in the context of a formal legal proceeding leading to a trial. The final enumerated right—to counsel— should be construed together with the seven preceding rights in section 10 that ensure a fair trial in criminal proceedings and cases involving the liberty of the accused. We read words not in isolation, but rather in context, consistent with our canon of construction *noscitur a sociis*, which "summarizes the rule of both language and law that the meanings of particular words may be indicated or controlled by associated words." *Peak v. Adams*, 799 N.W.2d 535, 547 (Iowa 2011) (quoting 11 Richard A. Lord, *Williston on Contracts* § 32:6, at 432 (4th ed. 1999)). This canon has been "colorfully explained by Lord Macmillan as 'words of a feather flock together.' " *Mall Real Estate, L.L.C. v. City of Hamburg*, 818 N.W.2d 190, 202 (Iowa 2012) (Cady, J., dissenting) (quoting Hugh Pattison Macmillan, Rt. Hon. Lord, *Law and Language*, Presidential Address to the Holdsworth Club (May 15, 1931)). It makes sense to construe the right to counsel as attaching when the State files charges in court. That happened eleven days after Senn submitted to the chemical breath test on the night of his arrest.

A prosecution is defined as "the commencement, including the filing of a complaint, and continuance of a criminal proceeding, and pursuit of that proceeding to final judgment on behalf of the state." Iowa Code § 801.4(13); *accord State v. Dudley*, 766 N.W.2d 606, 617–18 (Iowa 2009) (holding a criminal prosecution for the purposes of the Iowa Constitution is coextensive with the statutory definition of "prosecution"); *see also Prosecution*, Black's Law Dictionary (10th ed. 2014) (defining "prosecution" as "[a] criminal proceeding in which an accused person is tried"). A "case" is a "civil or criminal proceeding, action, suit, or

controversy at law or in equity." *Case*, Black's Law Dictionary; *see also Ex parte Grace*, 12 Iowa 208, 214 (1861) (holding the legislature cannot "fritter[] away or [break] down" a party's rights by creating procedures in place of "a suit, an action, [or] a trial"). A criminal proceeding does not begin until a document is filed with the court.

The grammatical subject in article I, section 10 is "the accused." An "accused" is "one charged with an offense[, especially] the defendant in a criminal case." *Accused*, Webster's Third New International Dictionary (unabr. ed. 2002). The accused's rights under this section relate to "the accusation against him." *See* Iowa Const. art. I, § 10; *see also State v. Burch*, 199 Iowa 221, 228, 200 N.W. 442, 445 (1924) (holding section 10 "requires the defendant 'to be informed of the accusation against him; to have a copy of the same when demanded' [and t]he word 'accusation' manifestly refers to the indictment").

By contrast, the other sections of article I provide rights more broadly to "persons" or "the people." *See, e.g.*, Iowa Const. art. I, §§ 1–4, 7–9, 12 (concerning "persons" and "the people"); *id.* art. I, § 6 ("citizens"); *id.* art. I, § 11 ("defendant"). We may infer from the unique word choice in section 10—"the accused"—that the framers intended to limit the rights therein to persons accused in formal criminal proceedings. *See Chiodo v. Section 43.24 Panel*, 846 N.W.2d 845, 853 (Iowa 2014) (plurality opinion) ("If the drafters intended the two concepts[—*i.e.,* felonies and infamous crimes—]to be coextensive, different words would not have been used.").

If we reword section 10 to put the grammatical subject ("the accused") first, it reads,

> [The accused i]n all criminal prosecutions, and in cases involving the life, or liberty of an individual . . . shall have a right to a speedy and public trial by an impartial jury; to be

> informed of the accusation against him, to have a copy of the same when demanded; to be confronted with the witnesses against him; to have compulsory process for his witnesses; and, to have the assistance of counsel.

Our caselaw interpreting article I, section 10 follows the foregoing construction. *County of Black Hawk v. Springer*, 58 Iowa 417, 418, 10 N.W. 791, 791 (1881) ("[T]his provision applies only to criminal prosecutions, or accusations for offences against the criminal law, where it is sought to punish the offender by fine or imprisonment."); *State v. Collins*, 32 Iowa 36, 40 (1871) (holding article I, section 10 "is a clear and express declaration of the right of the defendant 'in a criminal prosecution' 'to be confronted with the witnesses against him'" (emphasis omitted)); *State v. Polson*, 29 Iowa 133, 135 (1870) ("It will be observed that the right secured by this provision to the accused, to be confronted with the witnesses against him, is a personal right limited to proceedings in criminal prosecutions, or where the life or liberty of the citizen is involved.").

We have frequently emphasized that article I, section 10 protects the rights of an "accused." *Atwood v. Vilsack*, 725 N.W.2d 641, 650–51 (Iowa 2006) ("It protects only the rights of an 'accused,' not the rights of the individual facing potential civil commitment pursuant to Iowa's [sexually violent predator] statute."); *In re Johnson*, 257 N.W.2d 47, 53 (Iowa 1977) (McCormick, J., concurring specially) ("Therefore we must decide without assistance of prior decisions whether a juvenile alleged to be delinquent is an 'accused' in a case involving the life or liberty of an individual within the contemplation of the framers."); *State v. Sereg*, 229 Iowa 1105, 1116, 296 N.W. 231, 236 (1941) ("Section[] 10 . . . of Article I of the constitution of Iowa provide for certain rights which are guaranteed to the accused . . . ."), *overruled on other grounds by Pitcher v.*

*Lakes Amusement Co.*, 236 N.W.2d 333, 338 (Iowa 1975); *State v. Henderson*, 217 Iowa 402, 407, 251 N.W. 640, 642 (1933) ("The constitution of this state guarant[e]es to every man accused of a crime the right to be confronted with the witnesses against him . . . ." (Quoting *State v. Lugar*, 115 Iowa 268, 270, 88 N.W. 333, 334 (1901).)); *see also State v. Duncan*, 233 Iowa 1259, 1264, 11 N.W.2d 484, 486 (1943) (Wennerstrum, J., dissenting) ("The question that is uppermost in the mind of the writer of this dissent is whether or not . . . the trial was afforded that degree of protection that our state constitution gives to an individual *charged with a crime.*" (Emphasis added.)). Accordingly, we have held that section 10 is not "applicable to [an] administrative proceeding resulting in [a] license revocation." *Gottschalk v. Sueppel*, 258 Iowa 1173, 1179, 140 N.W.2d 866, 869 (1966);[6] *see also Swenumson*, 210 N.W.2d at 662 ("It is well established that the state and federal constitutional right to counsel does not apply to an [administrative] implied consent proceeding.").

Two of our earliest cases noted that the framers intended article I, section 10 to provide rights to criminal defendants who are at risk of incarceration. In *Collins*, a case decided fourteen years after the adoption of the provision, our court described this provision as providing "a clear and express declaration of the *right*[s] of the defendant 'in a criminal prosecution.' " 32 Iowa at 40. In *Springer*, decided twenty-four years after the adoption of the provision, our court considered a constitutional challenge to an adjudication of insanity:

---

[6]In *Gottschalk*, the opinion referred to the Iowa counterpart to the Sixth Amendment of the Federal Constitution as article I, section 9. 140 N.W.2d at 869. Based on the analysis in the opinion, the court was referring to article I, section 10. *See id.* at 869–70.

> It is contended that before a person can be adjudged insane he is entitled to the safeguards provided for in this section. But it is clear to us that this provision applies only to criminal prosecutions, or accusations for offences against the criminal law, where it is sought to punish the offender by fine or imprisonment. The inquest of lunacy by a board of commissioners is in no sense a criminal proceeding. The restraint of an insane person is not designed as punishment for any act done. The insane are by the law taken into the care and custody of the state for treatment for their unfortunate infirmity. In our opinion, whatever may be thought of the power of the legislative department of the state to provide a special tribunal for the examination of persons alleged to be insane, the safeguards and limitations provided by our laws for the correction of any abuse which may arise from the acts of the commissioners are ample for the protection of the citizen.

58 Iowa at 418, 10 N.W. at 791–92. Senn was not a defendant in a criminal prosecution when he took the chemical breath test. The State was not seeking "to punish the offender by fine or imprisonment" when Officer Cuppy administered the test. *See id.* Instead, the police were investigating a crime. The State had not yet committed itself to prosecution based on the investigation to that point. There was not yet a prosecution or case against Senn.

We interpreted article I, section 10 again in *State v. Newsom*, in which we held that a police agent who started a conversation with a defendant represented by counsel violated article I, section 10. 414 N.W.2d 354, 359 (Iowa 1987). We tailored our holding to an accused criminal litigant:

> Independent of our sixth amendment analysis, we find that defendant's right to counsel under the Iowa Constitution, article I, section 10, was also violated. In so doing, we rely on our own interpretation of our state constitution. We broadly construe this provision to effectuate its purpose, which was to correct the imbalance between the position of *an accused* and the powerful forces of the State *in a criminal prosecution. An accused*, especially while in custody, is vulnerable to the express or implied suggestion that cooperation with those that hold the keys is in his or her best interest. Legal counsel can equalize the positions of the

*criminal litigants*, but only if the client is completely free to follow counsel's advice. *An accused* that is represented by counsel should not be subjected to a tug-of-war between defense counsel and agents of the State. We hold that our constitution prohibits agents of the State from initiating any conversations or dealings with *an accused* concerning the criminal charge on which representation of counsel has been sought. A violation of this prohibition by the State shall preclude any waiver, by an accused, of the right to counsel.

*Id.* (emphasis added). Again, this case cuts against Senn. Senn was not an accused defendant in a criminal prosecution when he was making phone calls from the police station.

In *Young*, our court determined that article I, section 10 provides a right to counsel to persons charged with misdemeanor offenses with potential incarceration. 863 N.W.2d at 281. We said,

[T]he language of the "all criminal prosecutions" provision of article I, section 10 is directed toward providing counsel in order to avoid the risk of *conviction*, not the risk of *incarceration*. And if this choice of language means anything, it is difficult to avoid the conclusion that the phrase "all criminal prosecutions" was expressly designed to avoid judicially imposed slicing and dicing of criminal prosecutions into two or more categories. The bill of rights of the Iowa Constitution embraces the notion of "inalienable rights," not rights that shrink and disappear based upon currently fashionable transient pragmatic assessments.

*Id.* at 278 (citations omitted). We noted,

While it may be that the "cases" language amounts to constitutional support for a right to counsel in qualifying civil contexts, it also strongly suggests that if a right to counsel exists in *civil cases* in which "liberty" is involved, it also must exist in *criminal prosecutions* in which "liberty" is also at stake.

*Id.* at 279 (emphasis added). When we discussed the "cases" clause, we focused on prosecutions, not investigations that precede formal charges. The State had not filed criminal charges against Senn at the time he was deciding whether to submit to the chemical breath test. Therefore, he was not entitled to counsel under article I, section 10.

We have only found one case applying article I, section 10 in the absence of a formal criminal prosecution. In *Grace*, the court found that a debtor was unconstitutionally held in contempt after a judge acting pursuant to a statute put the debtor in jail for refusing to give the money in his pocket to satisfy a judgment. 12 Iowa at 212. We found the statute was unconstitutional, holding,

> If [the statute's effects] can be permitted, then we do not see how far the legislature might not go, in providing for the trial of issues without a jury, their determination, and for the imprisonment of the party who failed to comply with the finding.

*Id.* at 216. Senn's argument is not supported by *Grace* because the debtor in that case was the civil defendant in the underlying execution on a judgment. A district court had issued the execution order on the creditor's request. In contrast, Senn was not involved with the court system when he was asked to submit to a chemical breath test. Therefore, his article I, section 10 rights had not attached.

Our caselaw indicates Senn did not have a right to counsel at the time of his chemical breath test. However, to answer Senn's contention that the right *should have* attached at that time, we now go on to consider whether there is any historical support for his claim in the drafting of the constitutional provision. We will then consider whether the constitutions and caselaw of other jurisdictions provide any support for his interpretation of our state constitution.

**B. The Drafting History of Article I, Section 10.** We next review the drafting history of article I, section 10 to put its origins in proper historical context and thereby evaluate Senn's claim that it was intended to provide a broader right to counsel than the Sixth Amendment. As both parties acknowledge, article I, section 10 was hotly

debated at Iowa's constitutional convention. For the sake of thoroughness, we include a history of all the proposed amendments to the section to provide context for the introduction of the additional language that was introduced into our constitution. Our review of this history provides no support for the view that the framers intended the right to counsel to attach before a case is filed in court.

> The rights guaranteed by Iowa's first ratified constitution stated,

> In all criminal prosecutions, the accused shall have a right to a speedy trial by an impartial jury; to be informed of the accusation against him; to be confronted with the witnesses against him; to have compulsory process for his own witnesses, and to have the assistance of counsel.

Iowa Const. art. II, § 10 (1846). The first proposed amendment to this provision in 1856 altered an accused's trial rights as follows:

> In all criminal prosecutions, the accused shall have a right to a speedy trial, *before* an impartial jury, *of the county or district in which the offense is alleged to have been committed, to demand the nature and cause of the accusation against him,* to be confronted by the witnesses against him, to have compulsory process for his own witnesses, and to have the assistance of counsel.

1 *The Debates of the Constitutional Convention of the State of Iowa* 102 (W. Blair Lord rep. 1857) [hereinafter *The Debates*], www.statelibraryofiowa.org/services/collections/law-library/iaconst (emphasis added). The proposed section gave "an accused party the right to be tried . . . where he is likely to have a more fair and impartial trial, than if taken to a distant part of the state." *Id.*

> Mr. Harris then moved to amend the provision as follows:

> In all criminal prosecutions, the accused shall have a right to a speedy trial before an impartial jury, of the County or District in which the offense is alleged to have been committed; to demand the nature and cause of the accusation against him, *and a copy thereof;* to be confronted by the witnesses against him, to have compulsory process

> for his own witnesses, and to have the assistance of counsel:
> *Provided this section shall not be construed to prevent the General Assembly from passing laws ordering a change of venue from one district to another.*

*Id.* at 119 (emphasis added). Harris explained that this amendment was intended to ensure that an accused could change venue when it was necessary, and he "would not have a man depend upon the courtesy of the court for a copy of the indictment, but give him the power to demand it as a matter of right." *Id.* at 119–20. This proposal generated vigorous debate. *See id.* at 119–23. Mr. Clark, a vocal proponent of the Committee's original amendment, argued the purpose of the amendment was "to place a safeguard around the rights of persons accused of crime." *Id.* at 122. Clark was concerned that under the old constitution "the legislature might pass a law . . . under which a man might be dragged against his will to some other county than that in which the offence is alleged to have been committed" for trial. *Id.* at 122. Mr. Clarke[7] stated the purpose of the amendments to section 10 were "for the benefit and to protect those charged with crime." *Id.* at 123. However, the Committee on Preamble and Bill of Rights did not agree with Harris's additional amendment because "those who are charged with crime" were already afforded that right under other provisions of the constitution. *Id.* at 124.

Clark submitted an additional amendment to section 10, which states in relevant part:

> In all criminal prosecutions, *and in all cases involving the life or liberty of an individual*, the accused shall have a right to a speedy *and public* trial before an impartial jury, of the County or District in which the offense is alleged to have

---

[7]There were two men named Mr. Clarke and one named Mr. Clark at the Iowa convention. Mr. Clark of Allamakee County and Mr. Clarke of Henry County actively debated article I, section 10 of the Iowa Constitution. *See generally* 1 *The Debates*, at 119–22.

been committed; to demand the nature and cause of the accusation against him, *and have a copy of the same when demanded;* to be confronted by the witnesses against him, to have compulsory process for his own witnesses, and to have the assistance of counsel.

*Id.* at 201. Harris moved to strike the language "and in all cases involving the life or liberty of an individual." 2 *The Debates*, at 736. Harris said that phrase would come into play in "two classes of cases . . . in which . . . a person would not be entitled to a jury trial in this state." *Id.* First, he was concerned that a "fugitive from justice" who had committed a crime in another state and fled into Iowa to be arrested would be entitled to a trial here. *Id.* Harris believed that interpretation would "come into conflict with the constitution of the United States." *Id.* Harris also believed the phrase would have ramifications for fugitive slaves in the state:

> I understand that this provision is inserted for the purpose of providing that instead of the fugitive slave having the trial by jury where his labor may be due, he shall have the trial here; which would be equivalent to saying at once, that any slave in the territory of this state shall have the right to assert his freedom, and cannot be remanded back into slavery.

*Id.* Clark first responded to Harris's concerns by stating that he believed the added language was duplicative of the United States Constitution's guarantee of due process of law. *Id.* at 737. Clark also denied that the section would allow another state's fugitive from justice to be tried in Iowa:

> The provision says that he shall not be deprived of liberty; that is, upon the final trial. It is upon the trial which is to settle for all coming time the question as to his right to liberty in that case. It is the final trial, the trial provided by law, according to the common laws, when the case is heard, the jury is [empaneled], and the verdict is pronounced. *It has no reference to his being arrested in preparation for trial.* Are not persons arrested every day for the purpose of

examination, to ascertain whether there is proper cause for retaining them until they shall be put on final trial?

*Id.* (emphasis added). But he confirmed that the language was intended to protect fugitive slaves from being tried out of state, which he viewed as an affront to Iowa's inherent sovereignty:

> I hold that unless we have the right to make a constitution which will secure me the right of jury trial, if I am claimed as a fugitive slave, without that right we are not a sovereign people. Without that right we cannot protect every individual member of society. Without that right we cease to be a sovereignty, and become dependent upon some other power. . . . And if I am [claimed as a fugitive slave and] found within the jurisdiction of this State, it is a principle of sovereignty, that if I am arraigned upon a charge that I do not own myself, that I am not a free man, I have the right to a trial here where I am found; and the laws of the State should guarantee to me that right . . . I do not care whether the case is probable or not.

*Id.* Clark acknowledged that the language may conflict with the Federal Fugitive Slave Act of 1850 but argued that even if it did, the courts would refuse to give the provision effect "because the higher law, the law of the United States, will override the provisions of our constitution." *Id.* at 738.

Mr. Wilson also spoke in support of the amendment by arguing that the country's founding fathers would support this philosophy and Harris's fears were unfounded. *Id.* at 739. Wilson said, "I well know that there was a time in the history of this country when men were not afraid to say, that in all cases involving life or liberty, man should be entitled to trial by jury." *Id.* He argued that the "sooner we assert our determination to stand by the principles of the Fathers, the better for our country, the better for ourselves, the better for posterity." *Id.* Wilson argued that territorial jurisdiction prevented a fugitive from justice from being tried by an Iowa court because the underlying "crime cannot be punished excepting by the courts of the State having jurisdiction of the

offence." *Id.* He said a different jurisdictional rule controlled a fugitive slave captured in Iowa:

> [Y]ou do not charge upon a man the commission of any crime, and the charge is brought primarily against the man in the State where he is sought to be reclaimed. If you bring a charge against a man for having escaped from service or labor due in another State, your charge is primary in its character, and is brought where you find the man. What is the presumption of law in that case? The presumption is that every man is a freeman until he is shown to be a slave. Where are you to determine that? Under the jurisdiction where the charge is brought, and not, as in the [fugitive-from-justice] case, under the jurisdiction where the crime was committed.

*Id.* Following this discussion, Harris's proposed deletion of "and in all cases involving the life or liberty of an individual" was rejected by a vote of 21 to 14. *Id.* at 741.

There can be no "doubt from the convention record that the disputed language was added to Art. I[, section] 10 in an effort to nullify the Fugitive Slave Act by giving persons accused as escaped slaves the right to jury trial in Iowa." *Johnson*, 257 N.W.2d at 54 (McCormick, J., concurring specially). Slave owners were required to go through a formal proceeding to pursue a fleeing slave under the Fugitive Slave Act of 1850. *See* Act of Sept. 18, 1850, ch. 60, § 4, 9 Stat. 462 (repealed 1864) (requiring "satisfactory proof" to pursue a fugitive slave).[8] To the extent that the framers intended to extend the rights provided under this

---

[8]The Fugitive Slave Act of 1850 required slave owners to provide "satisfactory proof" before a slave could be "reclaimed" from another jurisdiction. *See* Act of Sept. 18, 1850, ch. 60, § 4 (requiring satisfactory proof); *id.* § 6 (allowing slave owners to "pursue and reclaim" fugitive slaves). Although the Act permitted commissioners to determine whether a slave could be "reclaimed," the commissioners were "authorized to exercise the powers that any justice of the peace, or other magistrate of any of the United States, may exercise in respect to offenders for any crime or offense against the United States," including the "power to . . . take acknowledgements of bail and affidavits, and to take depositions of witnesses in civil causes." *Id.* §§ 1–2, 4.

section, the additional breadth provided by the "cases" clause refers to a right to a jury trial in a pending court case. *See Grace*, 12 Iowa at 213 ("We can not believe that [the change in section 10 of the Bill of Rights] was intended to give the right of trial by jury to the occasional fugitive slave found in our State, and to withhold it in cases of equal magnitude and vital importance, from the half million of free white inhabitants of the State."). The framers consistently and exclusively focused on the rights of persons who had already entered the court system. The historical record for article I, section 10 shows that the framers intended the right to counsel to apply only after pleadings have been filed in court to commence a case or criminal proceeding.

**C. Other Jurisdictions.** We next examine decisions applying the right to counsel under similar constitutional provisions of other jurisdictions. First, we review federal precedent applying the Sixth Amendment right to counsel. Second, we consider how other state courts have applied the Sixth Amendment in implied-consent proceedings. Third, we survey the jurisdictions that have analyzed the right to counsel under state constitutional provisions. We conclude that no jurisdiction has provided a full constitutional right to counsel for implied-consent proceedings. We decline to follow the distinct minority of courts that recognize a limited state constitutional right to counsel for chemical breath tests before a formal criminal charge has been filed.

1. *United States Supreme Court precedent regarding the right to counsel.* Federal jurisprudence developed to address the unrepresented accused's inability to effectively present a defense in the court system:

> Even the intelligent and educated layman has small and sometimes no skill in the science of law. If *charged with crime*, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with

the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Powell v. Alabama*, 287 U.S. 45, 64, 53 S. Ct. 55, 69, 77 L. Ed. 158, 170 (1932) (emphasis added).

The Supreme Court provided safeguards to ensure the right to counsel is more than an empty right. Under the Sixth Amendment right to counsel, a person is entitled to effective assistance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). The right to counsel includes the right to have counsel appointed at government expense if the defendant is indigent. *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 796–97, 9 L. Ed. 2d 799, 805 (1963). A defendant who is not indigent is entitled to "choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S. Ct. 2557, 2561, 165 L. Ed. 2d 409, 416 (2006). Moreover, the right to counsel may not be abandoned without a knowing and intelligent waiver of that right. *Johnson v. Zerbst*, 304 U.S. 458, 463–64, 58 S. Ct. 1019, 1022–23, 82 L. Ed. 1461, 1466 (1938).

The Supreme Court employs a two-part test to determine whether the accused has a right to counsel. First, the right must have attached, which means that "formal judicial proceedings have begun." *Rothgery v. Gillespie County*, 554 U.S. 191, 211, 128 S. Ct. 2578, 2591, 171 L. Ed. 2d 366, 382 (2008). Second, it must be a "critical stage" of the prosecution. *See id.* ("If, indeed, the County had simply taken the cases at face value, it would have avoided the mistake of merging the

attachment question (whether formal judicial proceedings have begun) with the distinct 'critical stage' question (whether counsel must be present at a postattachment proceeding unless the right to assistance is validly waived).").

In *United States v. Wade*, a defendant argued he had a right to counsel during a postindictment lineup at a courtroom. 388 U.S. 218, 220, 87 S. Ct. 1926, 1928–29, 18 L. Ed. 2d 1149, 1153 (1967). During the lineup, each person wore strips of tape like the ones worn by the robber and were forced to say something like "put the money in the bag." *Id.* The Court explained that the Sixth Amendment right to counsel is not limited to the trial:

> [I]n addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone *against the State at any stage of the prosecution*, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial. The security of that right is as much the aim of the right to counsel as it is of the other guarantees of the Sixth Amendment—the right of the accused to a speedy and public trial by an impartial jury, his right to be informed of the nature and cause of the accusation, and his right to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor. The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution.

*Id.* at 226–27, 87 S. Ct. at 1932, 18 L. Ed. 2d at 1157 (footnotes omitted) (emphasis added). The Court focused on "whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *Id.* at 227, 87 S. Ct. at 1932, 18 L. Ed. 2d at 1157.

The *Wade* Court found a right to counsel because there was "grave potential for prejudice, intentional or not, in the pretrial lineup, which

may not be capable of reconstruction at trial, and [because] presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial." *Id.* at 236, 87 S. Ct. at 1937, 18 L. Ed. 2d at 1162. "Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an 'intelligent waiver.'" *Id.* at 237, 87 S. Ct. at 1937, 18 L. Ed. 2d at 1163.

But the Court agreed with the government that gathering scientific evidence does not implicate the right to counsel:

> [A] mere preparatory step in the gathering of the prosecution's evidence [is] not different—for Sixth Amendment purposes—from various other preparatory steps, such as systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like. We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial.

*Id.* at 227–28, 87 S. Ct. at 1932–33, 18 L. Ed. 2d at 1157–58. In our view, the Datamaster breathalyzer test is an example of scientific evidence gathering.

In *Kirby v. Illinois*, the Court refused to extend the right to counsel to routine police investigations preceding indictment. 406 U.S. 682, 689–90, 92 S. Ct. 1877, 1882–83, 32 L. Ed. 2d 411, 417–18 (1972) (plurality opinion). Thomas Kirby and Ralph Bean were arrested for carrying traveler's checks and a Social Security card bearing the name of

Willie Shard. *Id.* at 684, 92 S. Ct. at 1879–80, 32 L. Ed. 2d at 414–15. The two men claimed they had "won them in a crap game." *Id.* at 684, 92 S. Ct. at 1880, 32 L. Ed. 2d at 415. Police officers arrested them and brought them to the police station. *Id.* When they reached the police station, the officers learned that Willie Shard had reported a robbery the day before. *Id.* at 684, 92 S. Ct. at 1879–80, 32 L. Ed. 2d at 415. Police brought Shard to the station to observe Bean and Kirby. *Id.* at 684, 92 S. Ct. at 1880, 32 L. Ed. 2d at 415. Shard identified them as the robbers. *Id.* at 684–85, 92 S. Ct. at 1880, 32 L. Ed. 2d at 415. Kirby and Bean were indicted six weeks later. *Id.* at 685, 92 S. Ct. at 1880, 32 L. Ed. 2d at 415. After they were convicted, they appealed on the ground that they had a right to counsel at the meeting with Shard at the police station. *Id.* at 686–87, 92 S. Ct. at 1881, 32 L. Ed. 2d at 416.

The Court affirmed their convictions. *Id.* at 691, 92 S. Ct. at 1883, 32 L. Ed. 2d at 419. The Court refused to extend *Wade* and focused on whether the right to counsel had attached:

> The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which *alone* the explicit guarantees of the Sixth Amendment are applicable.
>
> In this case we are asked to import into a routine police investigation an absolute constitutional guarantee historically and rationally applicable only after the onset of formal prosecutorial proceedings. We decline to do so. Less than a year after *Wade* and *Gilbert* were decided, the Court explained the rule of those decisions as follows: "The rationale of those cases was that an accused is entitled to counsel at any 'critical stage of the prosecution,' and that a post-indictment lineup is such a 'critical stage.' " We decline

> to depart from that rationale today by imposing a per se exclusionary rule upon testimony concerning an identification that took place long before the commencement of any prosecution whatever.

*Id.* at 689–90, 92 S. Ct. at 1882–83, 32 L. Ed. 2d at 417–18 (emphasis added) (footnote omitted) (citations omitted) (quoting *Simmons v. United State*s, 390 U.S. 377, 382–83, 88 S. Ct. 967, 970, 19 L. Ed. 2d 1247, 1252 (1968)).

In *United States v. Ash,* the Court considered whether a postindictment photographic lineup shown to four witnesses was a critical stage in the prosecution. 413 U.S. 300, 300–01, 93 S. Ct. 2568, 2569, 37 L. Ed. 2d 619, 621 (1973). The Court explained that the critical-stage analysis "call[s] for examination of the event in order to determine whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *Id.* at 313, 93 S. Ct. at 2575, 37 L. Ed. 2d at 628. Ash was not present during the photographic display and had no right to be present, so "no possibility ar[ose] that the accused might [have been] misled by his lack of familiarity with the law or overpowered by his professional adversary." *Id.* at 317, 93 S. Ct. at 2577, 37 L. Ed. 2d at 631. The Court held there was no "right to counsel at photographic displays conducted by the Government for the purpose of allowing a witness to attempt an identification of the offender." *Id.* at 321, 93 S. Ct. at 2579, 37 L. Ed. 2d at 633.

In *United States v. Gouveia,* the Supreme Court held a prison inmate does not have a right to a court-appointed attorney while in an administrative detention before an official indictment is filed. 467 U.S. 180, 192–93, 104 S. Ct. 2292, 2300, 81 L. Ed. 2d 146, 157 (1984). Prison officials suspected Adolpho Reynoso and William Gouveia had murdered a fellow inmate. *Id.* at 182–83, 104 S. Ct. at 2294, 81

L. Ed. 2d at 150. Reynoso and Gouveia were placed in an administrative detention unit for approximately nineteen months without appointed counsel. *Id.* at 182–83, 104 S. Ct. at 2294–95, 81 L. Ed. 2d at 150–51. During their time in administrative detention "prison officials held disciplinary hearings" and determined that the respondents had participated in the murder. *Id.* While in administrative detention, "their participation in various prison programs was curtailed, [but] they were still allowed regular visitation rights, exercise periods, access to legal materials, and unmonitored phone calls." *Id.* at 183, 104 S. Ct. at 2295, 81 L. Ed. 2d at 151. A similar procedure was used before Robert Mills and Richard Pierce were indicted for a separate inmate murder. *Id.* at 184, 104 S. Ct. at 2295, 81 L. Ed. 2d at 151.

The Court held there was no right to a court-appointed attorney because the government had not initiated adversarial judicial proceedings. *Id.* at 192, 104 S. Ct. at 2300, 81 L. Ed. 2d at 157. The court said, "[O]ur cases have long recognized that the right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant." *Id.* at 187, 104 S. Ct. at 2297, 81 L. Ed. 2d at 153. The Court explained that the attachment timing was justified by the plain language of the Sixth Amendment and fulfilled the purpose for the amendment, and it distinguished the cases in which attachment occurred prior to trial:

> [G]iven the plain language of the Amendment and its purpose of protecting the unaided layman at critical confrontations with his adversary, our conclusion that the right to counsel attaches at the initiation of adversary judicial criminal proceedings "is far from a mere formalism." It is only at that time "that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces

of organized society, and immersed in the intricacies of substantive and procedural criminal law."

*Id.* at 188–89, 104 S. Ct. at 2297–98, 81 L. Ed. 2d at 154–55 (citation omitted) (quoting *Kirby*, 406 U.S. at 689, 92 S. Ct. at 1882, 32 L. Ed. 2d at 418).

In *Rothgery*, the Court gave further guidance on when a prosecution commences. 554 U.S. at 213, 128 S. Ct. at 2592, 171 L. Ed. 2d at 383. Walter Rothgery was arrested based on an erroneous record that he had been convicted of a felony. *Id.* at 195, 128 S. Ct. at 2581, 171 L. Ed. 2d at 372. Rothgery was brought before a magistrate because the officers did not have an arrest warrant. *Id.* at 195, 128 S. Ct. at 2581, 171 L. Ed. 2d at 373. The arresting officer submitted an affidavit that claimed that Rothgery was charged with a felony. *Id.* at 196, 128 S. Ct. at 2582, 171 L. Ed. 2d at 373. The magistrate determined there was probable cause for the arrest and set a $5000 bond. *Id.* Rothgery posted the bond, which stated that "Rothgery stands charged by complaint." *Id.* Rothgery did not have money for a lawyer, and his requests for one were denied. *Id.* Six months later, a lawyer was appointed for Rothgery, who assembled the relevant paperwork and relayed the information to the district attorney, who dismissed the indictment. *Id.* at 196–97, 128 S. Ct. at 2581, 171 L. Ed. 2d at 373.

The Court reiterated the right to counsel "does not attach until a prosecution is commenced." *Id.* at 198, 128 S. Ct. at 2582, 171 L. Ed. 2d at 374 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207, 115 L. Ed. 2d 158, 166 (1991)). A prosecution commences at "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* (quoting *Gouveia*, 467 U.S. at 188, 104

S. Ct. at 2297, 81 L. Ed. 2d at 154). The Court held the prosecution had commenced against Rothgery when he was brought before the judicial magistrate because

> an accusation filed with a judicial officer is sufficiently formal, and the government's commitment to prosecute it sufficiently concrete, when the accusation prompts arraignment and restrictions on the accused's liberty to facilitate the prosecution. From that point on, the defendant is "faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law" that define his capacity and control his actual ability to defend himself against a formal accusation that he is a criminal. By that point, it is too late to wonder whether he is "accused" within the meaning of the Sixth Amendment, and it makes no practical sense to deny it.

*Id.* at 207, 128 S. Ct. at 2589, 171 L. Ed. 2d at 380 (citations omitted) (quoting *Kirby*, 406 U.S. at 689, 92 S. Ct. at 1882, 32 L. Ed. 2d at 418). It is irrelevant whether a public prosecutor is aware or involved in the initiated proceedings. *Id.* at 194–95, 128 S. Ct. at 2581, 171 L. Ed. 2d at 372. In sum, the court concluded

> a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel.

*Id.* at 213, 128 S. Ct. at 2592, 171 L. Ed. 2d at 383.

The Supreme Court has never held that the Sixth Amendment provides a right to counsel before submitting to chemical testing.[9] The

---

[9]In *Missouri v. McNeely*, the United States Supreme Court held "that in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant" under the Fourth Amendment. 567 U.S. ___, ___, 133 S. Ct. 1552, 1568, 185 L. Ed. 2d 696, 715 (2013). The Court said that "a compelled physical intrusion beneath McNeely's skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation . . . implicate[d] an individual's 'most personal and deep-rooted expectations of privacy.'" *Id.* at ___, 133 S. Ct. at 1558, 185 L. Ed. 2d at

Court was presented with the question in 1985 but dismissed the appeal for want of a federal question over two dissenting justices. *Nyflot v. Minnesota Comm'r of Pub. Safety*, 474 U.S. 1027, 1027, 106 S. Ct. 586, 586, 88 L. Ed. 2d 567, 567 (1985) (mem.). In *Roberts v. State*, the United States Court of Appeals for the First Circuit concluded that a driver did not have the right to counsel during an implied-consent proceeding

> because the police were still waiting for the outcome of their investigation—either from the results of the blood/alcohol test or from the fact of defendant's refusal to submit to the test—before deciding whether or not to bring charges against the defendant. The government had not yet crossed the constitutional divide between investigator and accuser. As a threshold matter, the right to counsel had not yet attached when [the defendant's] request for counsel was denied . . . .

48 F.3d 1287, 1291 (1st Cir. 1995). Senn cites no federal authorities to the contrary.

2. *State cases applying the federal constitutional right to counsel.* We next turn to state cases applying the federal right to counsel. We begin with our own state. In *Walker*, we held the "Sixth Amendment right to counsel had not yet attached at the time [the detainee] was asked to perform the breath test." 804 N.W.2d at 293. We held in *Vietor* there was no violation of the arrestee's Sixth Amendment right to counsel when evidence of his uncounseled test refusal was admitted at trial. 261

---

704 (quoting *Winston v. Lee*, 470 U.S. 753, 760, 105 S. Ct. 1611, 1616, 84 L. Ed. 2d 662, 668 (1985)); *see also Birchfield*, 579 U.S. at ___, ___ S. Ct. at ___, ___ L. Ed. 2d at ___ ("The impact of breath tests on privacy is slight . . . . Blood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test."). Senn has not raised any Fourth Amendment challenge and submitted to a breath test, not a blood draw. Therefore, *McNeely* is inapposite.

N.W.2d at 830. In other cases, we explained why the right does not attach before formal criminal charges are filed.

In *State v. Johnson*, the police filed a complaint against Kevin Johnson for abandonment of a dependent person after his wife reported their child missing. 318 N.W.2d 417, 420, 427 (Iowa 1982). At 3:55 p.m., police officers arrested Johnson, Mirandized him, and asked him questions about the child. *Id.* at 427. Johnson's attorney called and interrupted the interview to speak with him. *Id.* at 428. At 4:30 p.m., Johnson's attorney came to the jail and spoke with the police and the defendant. *Id.* A few hours later, his wife told the police that the child was dead and buried in a wooded area. *Id.* When the police were unable to find the child's body, they interrogated Johnson, who made statements about the burial. *Id.* Johnson appealed, alleging in part that he was denied his Sixth Amendment right to counsel during the second interview. *Id.*

We concluded that Johnson was denied his right to counsel in the second interview:

> An accusatory instrument in the form of a complaint had been filed requesting that a warrant issue for defendant's arrest and that defendant be dealt with according to law. The county attorney's involvement in filing the complaint and procuring the warrant focused the prosecutorial forces on defendant. Given the significant level of prosecutorial involvement at this stage of the case, defendant's arrest can hardly be characterized as purely investigatory in nature. The forces of the State had solidified in a position adverse to defendant, at least with respect to the abandonment charge growing out of the incident.

*Id.* at 434–35 (citations omitted).

Unlike the prosecutorial forces at play in *Johnson*, the implied-consent procedure was investigatory here. The State was not yet

committed to prosecuting Senn. The county attorney was not involved, and no charging papers were filed with the court for another eleven days.

The Kansas Supreme Court refused to find a right to counsel during chemical testing because it was not a critical stage in the prosecution. *State v. Bristor*, 691 P.2d 1, 5 (Kan. 1984). The *Bristor* court recognized that a driver faces serious consequences from a chemical breath test and that "the advice of counsel can be useful because a driver may be dazed as a result of the alcohol, an accident, or both." *Id.* But the court concluded that "[n]ot every evidence-gathering procedure is a critical stage." *Id.*

The Maine Supreme Court reached a similar conclusion based on the autonomous nature of choosing whether or not to take a test:

> There is little counsel could do in making a test decision (or, even, during the administration of the test) for the defendant. The test is, in fact, a "mere preparatory step"; the officers, short of using improper test administration procedures or tampering with the specimen, can do nothing to impair the defendant's subsequent fair trial. If the officers do engage in such improper conduct, the defendant can effectively confront that aspect of the Government's case at trial.

*State v. Jones*, 457 A.2d 1116, 1118 n.5 (Me. 1983).

The New Mexico Court of Appeals held no right to counsel had attached when the driver submitted to a breath test:

> We are not unmindful of the issues defendants raise regarding the practical effect of failing a [breath alcohol test], being issued a citation and having the narrative portion of a charging instrument filled out by the arresting police officer. While it may be true that this combination of occurrences leads to State prosecution in a high percentage of cases, it does not of itself amount to the kind of prosecutorial commitment which the United States Supreme Court has recognized as implicating the sixth amendment.

*State v. Sandoval*, 683 P.2d 516, 519 (N.M. Ct. App. 1984).

Senn has cited no decisions extending the Sixth Amendment right to counsel to a driver's decision to submit to a chemical breath test before formal criminal charges are filed. The authorities are unanimous that such a right has not yet attached under the Sixth Amendment.

3. *Jurisdictions with no state constitutional right to counsel during implied-consent proceedings.* The vast majority of courts deciding the issue conclude there is no state constitutional right to counsel at the time the motorist must decide whether to submit to chemical testing.[10]

---

[10]*See, e.g.*, *Rackoff v. State*, 637 S.E.2d 706, 708–09 (Ga. 2006) ("Rackoff was not entitled to consult with a lawyer before deciding whether to submit to a breath test under the Sixth Amendment or the Georgia Constitution."); *State v. Severino*, 537 P.2d 1187, 1189 (Haw. 1975) ("[A] motorist is not entitled to consult with counsel before deciding to submit to the chemical test prescribed by the implied consent statute."); *Commonwealth v. Brazelton*, 537 N.E.2d 142, 143 (Mass. 1989) ("The moment at which a person must decide to take or to refuse to take a breathalyzer test is not a critical stage in the criminal process."); *State v. Armfield*, 693 P.2d 1226, 1228 (Mont. 1984) ("Neither the United States nor Montana constitutions guarantee a defendant the opportunity to seek an attorney's advice before deciding whether to submit or not to submit to a blood alcohol test."), *abrogated on other grounds by State v. Reavley*, 79 P.3d 270, 279 (Mont. 2003); *Wiseman v. Sullivan*, 211 N.W.2d 906, 910 (Neb. 1973) ("[A] driver who has been arrested for operating a motor vehicle upon a public street or highway while under the influence of intoxicating liquor is not entitled under either the federal or state Constitutions or the implied consent statute to consult with a lawyer previous to giving a sample of blood, breath, or urine under the implied consent act, or to have a lawyer present during the giving of the sample."); *State v. Leavitt*, 527 A.2d 403, 407 (N.J. 1987) (holding "[n]o provision of the New Jersey Constitution or statutes furnishes" the guarantee to assistance of counsel when "a motorist [is] requested to furnish a breath or blood sample"); *State v. Howren*, 323 S.E.2d 335, 336–37 (N.C. 1984) (holding the right to counsel had not attached under either the United States or North Carolina Constitution, reasoning that "[t]he fact that as a matter of grace the legislature has given defendant the right to refuse to submit to chemical analysis, and suffer the consequences for refusing, does not convert this step in the investigation into a critical stage in the prosecution"); *Commonwealth v. McCoy*, 975 A.2d 586, 591 (Pa. 2009) ("Submission to a chemical test upon being stopped for suspected DUI is an evidence-gathering circumstance, prior to the filing of any formal adversarial judicial proceedings, and as such does not constitute a critical stage for purposes of the right to counsel."); *Dunn v. Petit*, 388 A.2d 809, 812 (R.I. 1978) ("[W]e reject petitioners' argument that there is a [state or federal] constitutional right to counsel at the moment of decision concerning submission to a breathalyzer test . . . ."); *State v. Frasier*, 914 S.W.2d 467, 471 (Tenn. 1996) ("[W]e hold that a person arrested without a warrant on a reasonable suspicion of DUI does not have a due process right under the Tennessee Constitution to consult with an attorney before making the decision."); *Mogard v. City of Laramie*, 32 P.3d 313, 325 (Wyo. 2001) (affirming a "bright-line" rule that right to

Most states follow the federal right-to-counsel attachment standard under their state constitutional provision.[11]  The Pennsylvania Supreme Court surveyed precedent nationwide[12] when it expressly declined to find a broader right to counsel under the Pennsylvania Constitution: [13]

---

counsel "under the Sixth Amendment and Wyo[ming] Constitution art. I, § 10 is only required once charges are filed" and does not "extend to the time at which [an] arrestee is deciding whether to submit to chemical testing"); *cf. Law v. City of Danville*, 187 S.E.2d 197, 198 (Va. 1972) ("[D]enial of the right to consult with counsel before an accused decides whether to take a blood test does not violate the Sixth Amendment . . . [n]or . . . impair an accused's right . . . guaranteed by . . . the State Constitution.").

[11]*See, e.g.*, *People v. Anderson*, 842 P.2d 621, 622 & n.4 (Colo. 1992) (en banc) (citing the federal standard and noting "[w]e have adopted the same test for determining whether the right to counsel attaches under article II, section 16 of the Colorado Constitution"); *Rackoff*, 637 S.E.2d at 708–09 (applying federal attachment standard); *State v. Luton*, 927 P.2d 844, 849 (Haw. 1996) (applying the federal attachment standard to claim under the Hawaii Constitution); *Commonwealth v. Jones*, 526 N.E.2d 1288, 1292 (Mass. 1988) (noting the right to counsel under the Massachusetts Constitution "attaches only at or after the time that adversary judicial proceedings have been initiated against him" (quoting *Kirby*, 406 U.S. at 688, 92 S. Ct. at 1881, 32 L. Ed. 2d at 417)); *People v. Cheatham*, 551 N.W.2d 355, 359 n.8 (Mich. 1996) (noting the right to counsel under the Michigan Constitution "attaches only at or after the initiation of adversary judicial proceedings by way of formal charge, preliminary hearing, indictment, information, or arraignment" (quoting *People v. Wright*, 490 N.W.2d 351, 365 (Mich. 1992) (Riley, J., dissenting))); *State v. Delisle*, 630 A.2d 767, 767 (N.H. 1993) ("A defendant's right to assistance of counsel attaches 'by virtue of the commencement of formal criminal proceedings.' " (quoting *State v. Bruneau*, 552 A.2d 585, 587–88 (N.H. 1988))); *McCoy*, 975 A.2d at 590 (noting the right to counsel under the Pennsylvania Constitution is "coterminous with the Sixth Amendment right for purposes of determining when the right attaches"); *State v. Stephenson*, 878 S.W.2d 530, 547 (Tenn. 1994) (holding the state constitutional right to counsel was inapplicable because "[n]o adversary judicial proceedings had been initiated against the defendant at the time of the alleged 'invocation' of his right to counsel"), *abrogated on other grounds by State v. Saylor*, 117 S.W.3d 239, 245–46 (Tenn. 2003); *State v. Parizo*, 655 A.2d 716, 717 (Vt. 1994) (holding that the state constitutional right to counsel does not attach until there is a "criminal prosecution" as contemplated in *Kirby*); *State v. Earls*, 805 P.2d 211, 215 & n.5 (Wash. 1991) (en banc) ("The right to counsel under [the state constitution] also attaches only after the initiation of formal judicial proceedings."); *State ex rel. Bess v. Legursky*, 465 S.E.2d 892, 898 (W. Va. 1995) (holding the right to counsel does not attach until a "critical stage in the adversary proceedings") (quoting *State ex rel. Daniel v. Legursky*, 465 S.E.2d 416, 423 (W. Va. 1995))); *Mogard*, 32 P.3d at 322 ("A request for counsel made prior to the commencement of adversarial criminal proceedings does not invoke the right to counsel . . . under [the state constitution.]").

[12]Twelve of the thirteen state court decisions cited by the Pennsylvania Supreme Court remain good law.  *See Anderson*, 842 P.2d at 622 n.4; *Smith v. State*, 699 So. 2d

From our analysis of the opinions issued by our sister states, we conclude that the majority position of adhering to the federal rule on the attachment of the right to counsel is the most sensible. The plain language of Article I, § 9 limits the right to those situations where an "accused" is the subject of a "criminal prosecution". The terms "accused" and "all criminal prosecutions" are not mere verbiage with which we may summarily dispense. Rather, they are necessary terms which define the scope of this right. Were we to hold the attachment of the right to counsel is independent of the creation of an "accused" and the initiation of a "criminal prosecution," and is instead triggered by some earlier interaction between the police and the defendant, we would divorce this right from its constitutional basis. *Such a holding would create a rootless, ethereal "constitutional" right which would have no foundation in the constitution of this commonwealth.*

*Commonwealth v. Arroyo*, 723 A.2d 162, 169 (Pa. 1999) (emphasis added). We agree.

Our sister courts give several reasons why the right to counsel does not attach during an implied-consent proceeding. The Wyoming Supreme Court characterized its three main reasons why an implied-consent proceeding is not a critical stage of a criminal prosecution:

First, the function of the Sixth Amendment right to counsel is to preserve the defendant's right to a fair trial, once adversarial criminal proceedings have been commenced by the filing of a formal charge. Second, the chemical testing decision is " 'not essentially "a lawyer's decision" but, on the contrary, can be made by a defendant in the absence of the assistance of counsel without any substantial prejudice to

_____

629, 638 (Fla. 1997); *Luton*, 927 P.2d at 849–50; *Jones*, 526 N.E.2d at 1292; *Cheatham*, 551 N.W.2d at 359 n.8; *State v. Warren*, 499 S.E.2d 431, 439–40 (N.C. 1998); *Stephenson*, 878 S.W.2d at 547–48; *Poullard v. State*, 833 S.W.2d 270, 271–72 (Tex. App. 1992); *Parizo*, 655 A.2d at 717; *Earls*, 805 P.2d at 215 & n.5; *Bess*, 465 S.E.2d at 898; *Prime v. State*, 767 P.2d 149, 152–53 (Wyo. 1989). As we explain below, Minnesota departed from the Sixth Amendment analysis in *Friedman v. Commissioner of Public Safety*, 473 N.W.2d 828, 836–37 (Minn. 1991). Florida has recognized a broader right to counsel under its state constitution. *See Smith*, 699 So. 2d at 638 (noting that the Florida right to counsel will attach "as soon as feasible after custodial restraint").

[13]The right-to-counsel provision in Pennsylvania's constitution, entitled "Rights of accused in criminal prosecutions," states, "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel . . . ." Pa. Const. art. I, § 9.

[the accused's] rights under the sixth amendment.' " And third, the "right" to refuse the test is not a right at all, but is, at most, a statutory privilege or an "option" which may be strictly regulated by the state.

*Mogard v. City of Laramie*, 32 P.3d 313, 324 (Wyo. 2001) (alteration in original) (footnote omitted) (citations omitted) (quoting *State v. Delisle*, 630 A.2d 767, 768 (N.H. 1993)); *see also Commonwealth v. Brazelton*, 537 N.E.2d 142, 143 (Mass. 1989) ("The moment at which a person must decide to take or to refuse to take a breathalyzer test is not a critical stage in the criminal process."); *State v. Greene*, 512 A.2d 429, 432 (N.H. 1986) (holding the right to take a breath test is not a critical stage because advice is not necessary "to protect a defendant's right to a fair trial"); *State v. Howren*, 323 S.E.2d 335, 336–37 (N.C. 1984) (holding an implied-consent proceeding is not a critical stage of the prosecution); *Commonwealth v. McCoy*, 975 A.2d 586, 590 (Pa. 2009) (holding no right to counsel under the state constitution because the implied-consent proceeding "was not a 'critical stage' under [Pennsylvania] jurisprudence"); *McCambridge v. State*, 778 S.W.2d 70, 72 (Tex. Crim. App. 1989) (en banc) (holding the chemical breath test procedure "is not a 'critical stage' of the criminal process which necessitates either the prior consultation [with] or presence of counsel under the right-to-counsel provision of Article I, § 10 of the Texas Constitution" (quoting *Forte v. State*, 759 S.W.2d 128, 139 (Tex. Crim. App. 1988) (en banc))).

The Massachusetts Supreme Court focused on the inherent practical problems in concluding there is no right to counsel before submitting to a breathalyzer test:

> The recognition of a right to consult an attorney before deciding to take a breathalyzer test presents formidable practical problems. In the present case, the defendant wanted to call his private attorney. If an attorney is not available, a delay may ensue and the test results may then

be stale and inaccurate. The same result follows for one who
has no attorney or has no money to retain an attorney.

*Brazelton*, 537 N.E.2d at 143. The practical problem confronted in *Brazelton* is reflected in the record before us. Senn made numerous phone calls and had trouble getting an attorney on the phone, and he was unable to get an attorney to meet with him at the police station. If we hold the right to counsel attaches during an implied-consent proceeding, we will also need to determine whether that right, like the federal constitutional right to counsel, includes the right to an attorney at state expense if the motorist is indigent.

The Georgia Supreme Court rejected a defendant's right to counsel before deciding whether to take a chemical breath test because it would be unlikely that an attorney would be able to meaningfully assist the driver before the test:

> After all, the officer who administers the test must advise the driver of his implied consent rights pursuant to [the Georgia implied consent statute]. Thus, when it comes to consulting with a driver, there is very little that a lawyer could add that would substantially affect the fairness of the trial.

*Rackoff v. State*, 637 S.E.2d 706, 708–09 (Ga. 2006).

The Texas Supreme Court previously recognized a broader right to counsel under its state constitution but returned to the federal standard.[14] *See McCambridge*, 778 S.W.2d at 75–76. The *McCambridge* court explained it believed the "initiation of adversary criminal proceeding" language in *Kirby* was a departure from the analysis in *Wade*. *Id.* at 75. The court determined a case-by-case rule was unworkable:

---

[14]The right-to-counsel provision in Texas, entitled "Rights of accused in criminal prosecutions," states, "In all criminal prosecutions the accused shall have . . . the right of being heard by himself or counsel, or both . . . ." Tex. Const. art. I, § 10.

Since making that determination, however, we have concluded that the classification of a period in the criminal process as "critical" on a case by case basis is ambiguous, vague, and thus unworkable. Consistency is the objective of any legal standard. If consistency can be achieved it benefits both law enforcement and the public. Consequently, although we do not depart from our conclusion that the reasoning in *Kirby* cannot be logically reconciled with the converse reasoning in *Wade* and *Gilbert,* we are nonetheless persuaded that by adopting a bright line rule establishing when the critical stage in the criminal process occurs the public will ultimately benefit.

*Id.* at 75–76.

These authorities are persuasive. We too want to avoid creating an unworkable rule for determining when the right to counsel attaches. If we expand the right to counsel to include implied-consent chemical breath tests *before* any criminal case is filed, what is the limiting principle? Why stop there? Why not expand the right further to include noncustodial questioning by police or police requests for consent searches before any charges are filed? The text of our constitution provides a clear starting point for the attachment of the right to counsel—the court filing that commences the criminal proceeding or other case putting liberty at risk. We are unwilling to erase that bright line.

Only four jurisdictions—Florida, Oregon, Minnesota, and New York—have recognized a broader right to counsel under their state constitutions.[15] Even so, Florida does not recognize a right to counsel

---

[15]Maryland has a limited right to counsel during implied-consent proceedings based on its state constitutional right to due process. *Sites v. State*, 481 A.2d 192, 200 (Md. 1984). Subsequent cases have called *Sites* into doubt. *See Motor Vehicle Admin. v. Deering*, 92 A.3d 495, 507 (Md. 2014) ("Given the scarce support for th[e] analysis of the due process clause of the federal Constitution, the *Sites* Court's rationale rests on a precarious footing. Of course, because the *Sites* decision was also based on Article 24, it is conceivable that this Court could hold that the State constitution confers such a right, even if the federal Constitution does not."). The independent constitutional right to counsel in Maryland is based on their due process provision. *Id.* Senn did not argue

before submitting to a chemical breath test. A Florida appellate court rejected a defendant's argument that he had the right to counsel before submitting to a breathalyzer test in *State v. Burns*, 661 So. 2d 842, 847 (Fla. Dist. Ct. App. 1995). The court recognized that the right to counsel under the Florida Constitution attaches "at the earliest of the following points: when he or she is formally charged with a crime via the filing of an indictment or information, or as soon as feasible after custodial restraint, or at first appearance."[16] *Id.* (quoting *Traylor v. State*, 596 So. 2d 957, 970 (Fla. 1992)). This definition of the beginning of a prosecution is broader than the federal right because it encompasses "custodial restraint," which includes persons who are booked but not charged.[17] *See Traylor*, 596 So. 2d at 970 & n.38. The state, as in this case, argued that it is not feasible to supply counsel in impaired-driving cases. *Burns*, 661 So. 2d at 847. The court agreed the state's constitutional standard posed a serious practical problem:

> Whether the right to counsel was provided "as soon as feasible" is a nebulous gray area, the determination of which is completely dependent on how much importance is given the State's dilemma. Even stationing a public defender at the testing center would not solve the problem because there has been no judicial determination of a defendant's right to a public defender at this stage of the proceedings. Certainly if "feasible" means possible, then the right to counsel attached immediately at the center.

---

the Iowa due process clause in his motion to suppress. Accordingly, *Sites* does not support his argument.

[16]The Florida Constitution provides for the right to counsel in a provision entitled "Rights of accused and of victims": "In all criminal prosecutions[,] the accused shall . . . have the right . . . to be heard in person, by counsel or both . . . ." Fla. Const. art. I, § 16(a).

[17]When Florida expanded its rule, the court noted that there was a rule of criminal procedure that provided counsel to arrestees who were booked but not formally charged. *Traylor*, 596 So. 2d at 970 n.38; *see also* Fla. R. Crim. P. 3.111(a).

*Id.* But the court resolved the appeal by determining the testing was not at a critical stage in the prosecution because the test results could be challenged at trial. *Id.* at 848. The court emphasized that breathalyzer tests are essentially an evidence-gathering process, and the defendant is equally capable of representing himself as any defense counsel. *Id.* If the case goes to trial, defense counsel still has the opportunity to "attack the field tests and the breathalyzer tests through discovery, cross examination, and defense experts." *Id.*

These Florida cases illustrate that for Senn to prevail, we must find *both* that the right to counsel under the Iowa Constitution attaches before the beginning of a formal prosecution *and* that a primarily evidence-gathering activity can be a critical stage to the prosecution. We conclude Senn's argument fails on both fronts.

Senn relies primarily on the Minnesota Supreme Court's decision in *Friedman v. Commissioner of Public Safety*, 473 N.W.2d 828, 829, 836–37 (Minn. 1991).[18] Joy Friedman was arrested in Minneapolis when she failed a preliminary breath test. *Id.* at 829. The police officer took her to the police station to take an intoxilyzer test. *Id.* The machine was in use, so they waited twenty-five minutes at the station. *Id.* During this time, Friedman asked what her rights were and whether she could consult an attorney. *Id.* The officer did not allow her to contact an attorney. *Id.* A different officer took Friedman into a videotaping room and read her the implied-consent advisory three times. *Id.* The implied-consent advisory stated she had a right to consult an attorney after

---

[18]The Minnesota right-to-counsel provision, entitled "Rights of accused in criminal prosecutions," states, "In all criminal prosecutions[,] . . . [t]he accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor and to have the assistance of counsel in his defense." Minn. Const. art. I, § 6.

testing. *Id.* Friedman said she did not understand the advisory and that she had been tested in the squad car. *Id.* The police considered Friedman's response a refusal to be tested, which resulted in a one-year revocation of her drivers' license. *Id.*

The Minnesota Supreme Court noted, "As is often the case, the driver at this critical stage looked to the police for guidance. An attorney, not a police officer, is the appropriate source of legal advice." *Id.* at 833. The Court concluded a defendant is guaranteed a "limited right to counsel within a reasonable time before submitting to testing." *Id.* at 837. The court explained the right to counsel as follows:

> [A]ny person who is required to decide whether he will submit to a chemical test . . . shall have the right to consult with a lawyer of his own choosing before making that decision, provided that such a consultation does not unreasonably delay the administration of the test. The person must be informed of this right, and the police officers must assist in its vindication. The right to counsel will be considered vindicated if the person is provided with a telephone prior to testing and given a reasonable time to contact and talk with counsel. If counsel cannot be contacted within a reasonable time, the person may be required to make a decision regarding testing in the absence of counsel.

*Id.* at 835 (quoting *Prideaux v. Dep't of Pub. Safety,* 247 N.W.2d 385, 394 (Minn. 1976)).

Later Minnesota opinions have recognized the limited nature of the right to counsel in an implied-consent proceeding:

> We need only consider the right to counsel at issue here, the right to counsel for a test decision, which is more limited in nature than the right to counsel at a plea hearing or at trial. In *Friedman* we recognized that "the evanescent nature of the evidence in DWI cases requires that the accused be given a limited amount of time in which to contact counsel." The right is deemed forfeited if counsel is not contacted within a reasonable period of time, even if by no fault of the accused. There is no analogous durational limitation or forfeiture

consequence associated with the right to counsel at a plea hearing or at trial.

*State v. Schmidt*, 712 N.W.2d 530, 538 (Minn. 2006) (footnote omitted) (citations omitted) (quoting *Friedman*, 473 N.W.2d at 835). Significantly, Minnesota courts permit the police or jailer to monitor the detainee's phone calls with counsel. *Comm'r of Pub. Safety v. Campbell*, 494 N.W.2d 268, 270 (Minn. 1992). Evidence of the driver's telephonic statements with counsel may be suppressed during the criminal trial. *Id.* at 269–70 ("[T]he arrestee's rights will be sufficiently protected by the subsequent exclusion of any overheard statements or any fruits of those statements."). This does not help Senn. Senn was tried on the minutes of testimony. He made inculpatory statements during his phone call, but none of those admissions were included in the minutes.

The right to counsel articulated in *Friedman* and its progeny is no broader than the limited statutory right to counsel under Iowa Code section 804.20. If this proceeding had occurred in Minnesota, Senn would have no remedy. Senn was provided with a phone, offered a phone book, and given ample time to reach an attorney. In fact, Senn did reach his attorney and was allowed to consult with the attorney for almost a half hour. None of Senn's statements made to his lawyer on the phone call were used in the criminal case. Under the Minnesota precedent, Senn would have no remedy for Officer Cuppy's presence in the room during the phone call.

Senn likely would fare better under Oregon's broader state constitutional right to counsel:[19]

---

[19]The right to counsel in the Oregon Constitution is entitled "Rights of Accused in Criminal Prosecution": "In all criminal prosecutions, the accused shall have the right . . . to be heard by himself and counsel . . . ." Or. Const. art. I, § 11.

> We hold that, under the right to counsel clause in Article I, section 11 [of the Oregon Constitution], an arrested driver has the right upon request to a reasonable opportunity to obtain legal advice before deciding whether to submit to a breath test. Because evidence of an arrested driver's blood alcohol dissipates over time, the state is not required to wait for a long period of time before administering the test.

*State v. Spencer*, 750 P.2d 147, 155–56 (Or. 1988) (en banc) (footnote omitted). This right encompasses the ability to "consult with counsel in private," including over the phone. *State v. Durbin*, 63 P.3d 576, 579 (Or. 2003). The Oregon court said that "the purpose of the lawyer-client privilege cannot be fulfilled unless the communications between a client and a lawyer are confidential." *Id.*

But the Oregon right to counsel is not absolute because that state will not provide a lawyer at the state's expense for indigent persons during chemical testing, and the right may be forfeited. *State v. Smalls*, 120 P.3d 506, 508, 510–11 (Or. Ct. App. 2005); *see Spencer*, 750 P.2d at 155 ("In view of the exigencies attendant to the breath test process and the extraordinary expense [appointing counsel to indigents] would entail, we doubt that the Supreme Court would take the dictates of *Gideon v. Wainwright* . . . and its progeny that far."). The right to counsel in Oregon is limited to those who can afford lawyers.

New York has extended its state constitutional right to counsel to persons who are taken into custody, whether "as an 'accused,' a 'suspect,' or a 'witness.'" *People v. Hobson*, 348 N.E.2d 894, 897 (N.Y. 1976). The detainee is generally entitled to speak privately with counsel by phone. *People v. O'Neil*, 986 N.Y.S.2d 302, 312 (Dist. Ct. 2014). Senn does not cite or rely on New York precedent, presumably because of the textual differences in that state's constitution, which combines multiple rights—including due process, self-incrimination, and the right to

counsel—into one provision.[20]  Indeed, New York's highest court has stated,

> The Right to Counsel Clause in the State Constitution is more restrictive than that guaranteed by the Sixth

[20]New York's right-to-counsel provision, entitled "Grand Jury; Waiver of Indictment; Right to Counsel; Informing Accused; Double Jeopardy; Self-Incrimination; Waiver of Immunity by Public Officers; Due Process of Law," states,

> No person shall be held to answer for a capital or otherwise infamous crime (except in cases of impeachment, and in cases of militia when in actual service, and the land, air and naval forces in time of war, or which this state may keep with the consent of congress in time of peace, and in cases of petit larceny under the regulation of the legislature), unless on indictment of a grand jury, except that a person held for the action of a grand jury upon a charge for such an offense, other than one punishable by death or life imprisonment, with the consent of the district attorney, may waive indictment by a grand jury and consent to be prosecuted on an information filed by the district attorney; such waiver shall be evidenced by written instrument signed by the defendant in open court in the presence of his or her counsel. *In any trial in any court whatever the party accused shall be allowed to appear and defend in person and with counsel as in civil actions and shall be informed of the nature and cause of the accusation and be confronted with the witnesses against him or her.*  No person shall be subject to be twice put in jeopardy for the same offense; nor shall he or she be compelled in any criminal case to be a witness against himself or herself, providing, that any public officer who, upon being called before a grand jury to testify concerning the conduct of his or her present office or of any public office held by him or her within five years prior to such grand jury call to testify, or the performance of his or her official duties in any such present or prior offices, refuses to sign a waiver of immunity against subsequent criminal prosecution, or to answer any relevant question concerning such matters before such grand jury, shall by virtue of such refusal, be disqualified from holding any other public office or public employment for a period of five years from the date of such refusal to sign a waiver of immunity against subsequent prosecution, or to answer any relevant question concerning such matters before such grand jury, and shall be removed from his or her present office by the appropriate authority or shall forfeit his or her present office at the suit of the attorney-general.

> The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law.  No person shall be deprived of life, liberty or property without due process of law.

N.Y. Const. art. I, § 6 (emphasis added).

Amendment to the United States Constitution. Nevertheless, by resting the right upon this State's constitutional provisions guaranteeing the privilege against self-incrimination, the right to assistance of counsel and due process of law we have provided protection to accuseds far more expansive than the Federal counterpart.

*People v. Bing*, 558 N.E.2d 1011, 1014–15 (N.Y. 1990) (footnote omitted) (citations omitted). By contrast, the Iowa Constitution has separate provisions for due process and the right to counsel. *Compare* N.Y. Const. art. I, § 6 (including provisions regarding grand jury, waiver of indictment, right to counsel, informing accused, double jeopardy, self-incrimination, waiver of immunity by public officers, and due process of law), *with* Iowa Const. art. I, § 9 (providing right of trial by jury and due process of law); *id.* art. I, § 10 (providing rights of persons accused).

Senn relies solely on the right-to-counsel provision in article I, section 10 of the Iowa Constitution. He does not rely on the due process clause, the privilege against self-incrimination, or the right to be free of unreasonable searches and seizures. This case does not involve a police interrogation, blood draw, plea bargaining, or a lineup. New York's provision combining disparate rights is a poor interpretive analogue here.

Moreover, the combined New York provision more broadly refers repeatedly to "a person" in place of the narrower term used for a subset of persons who have been formally charged, "the party accused." *Compare* N.Y. Const. art. I, § 6 (referring several times to a "person" and once to "the party accused"), *with* Iowa Const. art. I, § 10 (referring only to "the accused"). For those reasons, the New York cases are inapposite.

Regardless, New York provides only a limited right to counsel for motorists arrested for suspicion of drunk driving. *People v. Smith*, 965 N.E.2d 928, 931 (N.Y. 2012). "[T]here is no absolute right to refuse to take the test until an attorney is actually consulted, nor can a defendant

use a request for legal consultation to significantly postpone testing." *Id.* If the defendant is unable to contact an attorney, the defendant "can be required to make a decision without the benefit of counsel's advice." *Id.* at 931–32.[21]

Senn would be entitled to reversal under the caselaw of only two other states—Oregon and New York. We are not persuaded to follow those outliers.

**D. Practical Problems.** We also consider the practical problems that would arise by recognizing a broader independent state constitutional right to counsel during implied-consent chemical testing. Senn claims that "an individual is entitled to, at a minimum, a *private* consultation with counsel at the time at which the State invokes implied consent" under the Iowa Constitution.

First, any Iowa constitutionally based right to counsel should apply equally to rich and poor alike. *See* Iowa Code § 63.6 (requiring judges to take an oath to "support the Constitution of the United States and the Constitution of the State of Iowa, and . . . administer justice according to the law, equally to the rich and the poor"). Iowa has recognized the right to appointed counsel for indigents at government expense in felony cases since 1850. *See Hall v. Washington County*, 2 Greene 473, 478–79 (Iowa 1850). We recently extended that right to

---

[21]New York's remedy for a failure to provide private access to counsel depends on whether the arrestee takes the test or refuses. If the defendant takes the test, the court will generally suppress all statements and the test results. *See People v. Moffitt*, 19 N.Y.S.3d 713, 719–20 (Crim. Ct. 2015) (suppressing test results, statements made to lawyer, and portion of video depicting conversation); *People v. Washington*, 964 N.Y.S.2d 176, 186 (App. Div. 2013) (suppressing test results). But if the arrestee refuses to take the test, the court will suppress the statements made to his or her lawyer but not the refusal itself. *O'Neil*, 986 N.Y.S.2d at 312 & n.3 (suppressing statements made to counsel but noting the violation of the defendant's right to counsel was "not a basis for suppression of the refusal" to take the test).

indigents facing misdemeanor charges with potential incarceration. *Young*, 863 N.W.2d at 281; *see also Luis v. United States*, 578 U.S. \_\_\_, \_\_\_, 136 S. Ct. 1083, 1089, \_\_\_ L. Ed. 2d \_\_\_, \_\_\_ (2016) (plurality opinion) ("[W]e have understood the right [to counsel] to require that the Government provide counsel for an indigent defendant accused of all but the least serious crimes . . . ."). A first offense OWI carries a potential jail sentence. Thus, if we hold an individual is constitutionally entitled to a private consultation with legal counsel at the time the State invokes implied consent, the State would need to ensure that public defenders or court-appointed lawyers are available twenty-four hours a day to field calls from detained motorists, typically late at night. *See Smalls*, 120 P.3d at 511.

In addition, we would need to provide continuous court and public defender access to process applications for court-appointed counsel. *See* Iowa Code § 815.10 (providing for "[a]ppointment of counsel by court"). The State cannot wait until the next morning to effectively test for evidence of blood alcohol content because the amount drops over time. *See Vietor*, 261 N.W.2d at 831 (holding the right to counsel "must be balanced against the practical consideration that a chemical test is to be administered within two hours of the time of arrest or not at all"). It simply is infeasible to assure indigent motorists statewide that lawyers will be available at government expense at any time of the day or night to advise them whether to submit to the breath test.

Second, if Senn was entitled to a private consultation with counsel over the phone, the police or jailers would have to determine who is on the other end of the line for each phone call made. Iowa Code section 804.20 applies to all detainees, not just motorists suspected of impaired

driving. It is easy to imagine detainees taking advantage of private phone calls to inform confederates to flee or get rid of evidence.

## IV. Conclusion.

For these reasons, we conclude the right to counsel under article I, section 10 of the Iowa Constitution does not attach until formal charges have been filed by the state in court. Accordingly, the arresting officer in this case did not violate Senn's constitutional right to counsel by remaining in the room during Senn's phone call with a lawyer. Senn's constitutional challenge to Iowa Code section 804.20 fails. We therefore affirm his conviction.

**DISTRICT COURT JUDGMENT AFFIRMED.**

Mansfield and Zager, JJ., join this opinion. Cady, C.J., files a special concurrence. Wiggins, J., files a dissenting opinion in which Hecht and Appel, JJ., join. Appel, J., files a separate dissenting opinion in which Wiggins and Hecht, JJ., join.

**CADY**, **Chief Justice (concurring specially).**

I concur in the result, but not because the right to counsel under the Iowa Constitution did not attach at the time the State initiated the implied-consent process. Even assuming the right to counsel did attach under the Iowa Constitution, I conclude Senn was not deprived of the right and that he has not shown the counsel he received was ineffective.

Senn claims that the decision to refuse or submit to a chemical test following an arrest for the crime of operating while intoxicated was a critical stage in the proceedings that supports the right to counsel. He claims the decision is a critical stage because legal counsel is needed to advise the arrestee of all of the consequences of the implied-consent process and its full impact. Nevertheless, Senn was in fact provided an opportunity to consult with an attorney before making the decision. He also took advantage of the opportunity by talking to an attorney on the telephone for twenty-eight minutes before making a decision.

Senn claims the conversation he had with the attorney did not satisfy the constitutional right to counsel. However, no evidence was introduced to explain how the conversation was inadequate in light of its purpose. Senn instead assumes the conversation was inadequate because a law enforcement officer could overhear his side of the conversation. This assumption is not warranted.

Senn essentially claims the constitutional right to counsel once implied consent is invoked should be greater than the statutory right to a phone conversation with an attorney in the presence of a law enforcement officer or a private in-person consultation. *See* Iowa Code § 804.20 (2013). Yet this claim was not supported by evidence that the advice Senn needed at that moment could only be provided through a

private phone conversation. It may be understandable that some attorneys want to personally assess the condition of a person arrested for operating while intoxicated before giving advice on whether or not to submit to the request for a chemical test. *See State v. Walker*, 804 N.W.2d 284, 287–88 (Iowa 2011) (detailing how an attorney's advice was impeded by a physical barrier between the attorney and his client and by video surveillance). However, this in-person assessment does not establish a minimum constitutional standard of counsel. Without evidence that effective counsel could not be provided by the type of phone call permitted in this case, I cannot conclude that the constitutional right to counsel would require any more legal assistance than Senn was provided in this case. Furthermore, Senn offered no evidence that the police officer's ability to hear his side of the phone call rendered the assistance ineffective.

We normally do not address constitutional claims in a case that can be resolved on other grounds. *See State v. Hellstern*, 856 N.W.2d 355, 360 (Iowa 2014) ("We . . . decide the statutory issue first in order to avoid unnecessary adjudication of constitutional claims."). This case falls within that rule. Senn was not denied any constitutional right to counsel because the facts of the case do not reveal that he failed to receive advice from counsel to assist in deciding to take a chemical test. For that reason, I concur only in the result in this case.

**WIGGINS, Justice (dissenting).**

There is no majority opinion in our resolution of this case today, and therefore there remains no decision from this court holding the right to counsel under article I, section 10 of the Iowa Constitution attaches only upon the filing of a criminal complaint.[22]  Because the plurality and concurring opinions combine to affirm John Arthur Senn Jr.'s conviction, however, I dissent.  I would hold Senn's right to counsel under article I, section 10 of the Iowa Constitution was violated when the State arrested him on suspicion of operating while intoxicated, invoked the statutory implied-consent procedure, asked him to submit to blood-alcohol testing, and denied him the opportunity to confidentially consult with his attorney.

Justice Waterman's plurality opinion disregards the clear import of the phrase "in cases involving the life, or liberty of an individual" in article I, section 10 to conclude the right to counsel under the Iowa Constitution applies only once formal criminal charges have been filed by the State.  Simply put, that is not what the language in article I, section 10 says; therefore, that is not how we should interpret it.  Furthermore, although the plurality opinion purports to find historical support for its crabbed interpretation of article I, section 10 in the debates of our constitutional convention, its factually inaccurate recounting of the relevant historical context renders equally inaccurate its assessment of

---

[22]In a plurality opinion joined by Justices Mansfield and Zager, Justice Waterman concludes the right to counsel under article I, section 10 of the Iowa Constitution attaches upon the filing of a criminal complaint.  In his special concurrence, Chief Justice Cady leaves open the question of when the right to counsel attaches under the Iowa Constitution.

the framers' intentions concerning the scope of the right to counsel under the Iowa Constitution.

Iowa Code section 804.20 grants arrested persons the right to call and consult with an attorney and a family member. It provides,

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay.

Iowa Code § 804.20 (2013). This case requires us to determine whether the limitations on the statutory right to counsel set forth in this provision conflict with the requirements of article I, section 10 of the Iowa Constitution as applied to a person arrested for operating while under the influence (OWI) who must decide whether to submit to a chemical test upon request by a police officer invoking the implied-consent procedure set forth in the Iowa Code. *See id.* §§ 321J.6, .8, .9.

A criminal defendant is assured the right to effective assistance of counsel by the constitutional guarantees of the right to counsel contained in the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution as well as the constitutional guarantees of due process of law assuring the right to a fair trial contained in the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution. *State v. Williams*, 207 N.W.2d 98, 104 (Iowa 1973). The Sixth Amendment

provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. In contrast, article I, section 10 provides, "In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right . . . to have the assistance of counsel." Iowa Const. art. I, § 10.

We have previously determined the Sixth Amendment right to counsel does not attach when a police officer invoking the implied consent procedure asks an OWI arrestee to submit to a chemical test. *See State v. Walker*, 804 N.W.2d 284, 293 (Iowa 2011). Accordingly, we held that denying an OWI arrestee the opportunity to consult with an attorney in the implied-consent context does not violate the Sixth Amendment to the United States Constitution. *State v. Vietor*, 261 N.W.2d 828, 830 (Iowa 1978).

However, we have never considered whether the right to counsel guaranteed by article I, section 10 of the Iowa Constitution affords an OWI arrestee the right to consult privately with an attorney when an officer invokes the implied-consent procedure and asks him or her to consent to a chemical test. *State v. Hellstern*, 856 N.W.2d 355, 357–58, 365 (Iowa 2014). *But see Gottschalk v. Sueppel*, 258 Iowa 1173, 1179, 140 N.W.2d 866, 869–70 (1966) (assuming without deciding the right to counsel assured by the Iowa Constitution did not apply to an administrative proceeding resulting in license revocation). Thus, this case requires us to decide a narrow question concerning the scope of the right to counsel assured by article I, section 10. Namely, we must determine whether article I, section 10 guaranteed Senn the right to counsel after he was arrested and Officer Cuppy invoked the implied-consent procedure. More precisely, we must determine whether Senn

faced either "criminal proceedings" against him or a "case involving the life, or liberty of an individual" when he was asked to consent to a chemical test following his arrest.[23]  Iowa Const. art. I, § 10.

---

[23]As we have previously acknowledged, the constitutional guarantees of due process of law afforded by the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution may require the appointment of counsel for indigent persons in contexts other than criminal prosecutions.  *See State ex rel. Hamilton v. Snodgrass*, 325 N.W.2d 740, 742 (Iowa 1982); *McNabb v. Osmundson*, 315 N.W.2d 9, 14 (Iowa 1982); *see also Turner v. Rogers*, 564 U.S. 431, 444–45, 131 S. Ct. 2507, 2517–18, 180 L. Ed. 2d 452, 463–64 (2011); *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 332, 105 S. Ct. 3180, 3195, 87 L. Ed. 2d 220, 240 (1985); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 31–32, 101 S. Ct. 2153, 2161–62, 68 L. Ed. 2d 640, 652 (1981).  For example, to determine whether an indigent person has a federal due process right to counsel when the Sixth Amendment right to counsel does not apply, a court must apply a modified version of the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18, 33 (1976). *Lassiter*, 452 U.S. at 26–27, 101 S. Ct. at 2159, 68 L. Ed. 2d at 649; *Snodgrass*, 325 N.W.2d at 742.

Senn raised only his right to counsel under article I, section 10 of the Iowa Constitution before the district court.  Thus, we do not consider whether his right to due process of law under the federal and state constitutions entitled him to effective assistance of counsel under the facts of this case.  *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").  We previously concluded a defendant who was not permitted the opportunity to speak with his attorney by phone before he consented to a chemical test was not deprived of due process of law without suggesting we considered the claim under both the United States Constitution and the Iowa Constitution.  *Gottschalk*, 258 Iowa at 1176, 1181–82, 140 N.W.2d at 868, 870–71.

The United States Supreme Court also recognized a limited right to counsel in the context of custodial interrogations implicating the Fifth Amendment privilege against compelled self-incrimination in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  *McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S. Ct. 2204, 2208, 115 L. Ed. 2d 158, 167 (1991).  However, the *Miranda* right to counsel under the Fifth Amendment to the United States Constitution does not extend to an OWI arrestee's choice to refuse chemical testing when an officer invokes implied-consent procedures because "a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of *Miranda*."  *South Dakota v. Neville*, 459 U.S. 553, 564 n.15, 103 S. Ct. 916, 923 n.15, 74 L. Ed. 2d 748, 759 n.15 (1983).

Although the Iowa Constitution does not contain an express provision equivalent to the Fifth Amendment guarantee against compelled self-incrimination, a right against compelled self-incrimination is implicit in the article I, section 9 guarantee of due process of law.  *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 518 n.2 (Iowa 2011).  Before the district court, Senn did not argue an officer asking him to consent to a chemical test

Notwithstanding the state constitutional focus of this inquiry, a brief review of the scope of the federal right to counsel guaranteed by the Sixth Amendment to the United States Constitution is instructive. Like the right to counsel guaranteed by article I, section 10, the right to counsel guaranteed by the Sixth Amendment applies to "all criminal prosecutions." *State v. Young*, 863 N.W.2d 249, 257 (Iowa 2015).

The Supreme Court has pegged the attachment of the Sixth Amendment right to counsel on "the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery v. Gillespie County*, 554 U.S. 191, 198, 128 S. Ct. 2578, 2583, 171 L. Ed. 2d 366, 374 (2008) (quoting *United States v. Gouveia*, 467 U.S. 180, 188, 104 S. Ct. 2292, 2297, 81 L. Ed. 2d 146, 154 (1984)). Nonetheless, though the Sixth Amendment by its terms refers to "criminal prosecutions," its protections need not be triggered by a prosecutor filing an indictment. *See id.* at 198–202, 128 S. Ct. at 2583–86, 171 L. Ed. 2d at 374–77. Rather, the Sixth Amendment right to counsel attaches once " 'the government has committed itself to prosecute,' 'the adverse positions of government and defendant have solidified,' and the accused 'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " *Id.* at 198, 128 S. Ct. at 2583, 171 L. Ed. 2d at 374 (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S. Ct. 1877, 1882, 32 L. Ed. 2d 411, 418

---

constituted the functional equivalent of custodial interrogation to which a prophylactic right to counsel broader than that afforded by *Miranda* and its progeny might apply under the Iowa Constitution. Accordingly, we need not consider whether an officer asking an arrestee to consent to chemical testing upon reading an implied-consent advisory constitutes an inherently coercive circumstance in which the due process guarantee of article I, section 9 affords the arrestee the assistance of counsel.

(1972) (plurality opinion)).  Thus, an individual may qualify as an accused for Sixth Amendment purposes before any prosecutorial involvement in a criminal proceeding against him whatsoever.  *See id.* at 208, 128 S. Ct. at 2589, 171 L. Ed. 2d at 380.  In other words, the Sixth Amendment right to counsel attaches once the wheels of our "system of adversary criminal justice" begin to turn.  *Kirby,* 406 U.S. at 689, 92 S. Ct. at 1882, 32 L. Ed. 2d at 417.  Moreover, the government's commitment to prosecute an individual may be sufficiently concrete to trigger the Sixth Amendment right to counsel once "the machinery of prosecution" has been "turned on by the local police" rather than a prosecutor.  *See Rothgery,* 554 U.S. at 208, 128 S. Ct. at 2589, 171 L. Ed. 2d at 380.  At that point, a prosecution against the accused has "commenced."  *See id.* at 198, 128 S. Ct. at 2583, 171 L. Ed. 2d at 374 (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S. Ct. 2204, 2207, 115 L. Ed. 2d 158, 166 (1991)).

Once the Sixth Amendment right to counsel has attached, it extends to "all critical stages of the criminal process."  *Iowa v. Tovar,* 541 U.S. 77, 80–81, 124 S. Ct. 1379, 1383, 158 L. Ed. 2d 209, 215 (2004).  Upon attachment, "the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial."  *United States v. Wade,* 388 U.S. 218, 226, 87 S. Ct. 1926, 1932, 18 L. Ed. 2d 1149, 1157 (1967).  Recognized critical stages of the criminal process at which an accused is entitled to assistance of counsel include, among others, arraignments, postindictment interrogations, postindictment lineups, and the entry of guilty pleas.  *Missouri v. Frye,* 566 U.S. ___, ___, 132 S. Ct. 1399, 1405, 182 L. Ed. 2d 379, 387 (2012).

In contrast to its Sixth Amendment counterpart, the right to counsel guaranteed by article I, section 10 of the Iowa Constitution applies not only in "all criminal prosecutions," but also "in cases involving the life, or liberty of an individual." *Young*, 863 N.W.2d at 257–58 (quoting Iowa Const. art. I, § 10). As the plurality acknowledges, to determine the scope of the right to counsel guaranteed by article I, section 10, we must consider how this distinction arose.

Before Iowa became a state, the provision in its territorial constitution guaranteeing the assistance of counsel to an accused provided,

> In all criminal prosecutions, the accused shall have a right to a speedy trial by an impartial jury, to be informed of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for his own witnesses, and to have the assistance of counsel.

Iowa Const. art. II, § 10 (1846). Following a state constitutional convention in 1857, Iowans voted to expand article I, section 10. Thus, the Iowa Constitution adopted in 1857 provided,

> In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial by an impartial jury; to be informed of the accusation against him, to have a copy of the same when demanded; to be confronted with the witnesses against him; to have compulsory process for his witnesses; and, to have the assistance of counsel.

Iowa Const. art. I, § 10 (1857). The language in article I, section 10 today remains identical to that contained in the Iowa Constitution of 1857.

The framers of our state constitution vigorously debated the scope of the right to counsel to be afforded by article I, section 10 during the constitutional convention at which our state constitution was adopted. The most spirited exchange during that debate was devoted to the

question of whether the rights guaranteed by article I, section 10 should apply "in all cases involving the life, or liberty of an individual." *See* 2 *The Debates of the Constitutional Convention of the State of Iowa* 735–41 (W. Blair Lord rep., 1857) [hereinafter *The Debates*], www.state libraryofiowa.org/services/collections/law-library/iaconst. However, the implications of that exchange for the proper interpretation of the scope of the right to counsel afforded by article I, section 10 come into focus only when we consider the historical context in which it occurred.

In 1793, Congress passed an act addressing "fugitives from justice, and persons escaping from the service of their masters." Act of Feb. 12, 1793, ch. VII, 1 Stat. 302 (codified in part as amended at 18 U.S.C. §§ 3182–83 (2012), repealed in part 1864). Though the Extradition and Fugitive Slave Clauses[24] of the United States Constitution endorsed interstate rendition, the 1793 Act represented the first time Congress had asserted its authority to legislate it. Christopher N. Lasch, *Rendition Resistance*, 92 N.C. L. Rev. 149, 171 (2013) [hereinafter Lasch]. Its purpose was to facilitate the extradition of fugitives from justice, i.e.,

---

[24]The Extradition Clause of the United States Constitution provides,

> A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

U.S. Const. art. IV, § 2, cl. 2

The Fugitive Slave Clause of the United States Constitution provides,

> No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.

U.S. Const. art. IV, § 2, cl. 3, *superseded by* U.S. Const. amend. XIII.

individuals alleged to have committed crimes, and fugitive slaves, i.e., individuals claimed as slaves who had fled to northern states. *See* Allen Johnson, *The Constitutionality of the Fugitive Slave Acts*, 31 Yale L.J. 161, 164 (1921) [hereinafter Johnson]. Prior to the passage of the 1793 Act, the growing division over slavery had fueled the perceived need for federal legislation addressing the rendition of fugitives from justice, which historically had been accomplished through comity. Lasch, 92 N.C. L. Rev. at 173. Accordingly, with respect to fugitives from justice, the 1793 Act provided that upon demand and presentation of an indictment or affidavit charging a person with committing any crime, the executive of the state or territory to which the person had allegedly fled should arrest and deliver the person to the appointed agent of the state or territory from which he or she had allegedly fled. § 1, 1 Stat. at 302. It further empowered the appointed agent to transport the alleged criminal to the state or territory from which he or she had allegedly fled and made interference with such transport a crime punishable by a fine or imprisonment. § 2, 1 Stat. at 302.

With respect to fugitive slaves, the 1793 Act authorized any person to whom labor or service was due, his agent, or his attorney to seize or arrest an individual, take the individual before any federal judge or local magistrate, and offer proof by oral testimony or affidavit that the individual owed service or labor under the law of a state or territory from which he or she fled. § 3, 1 Stat. at 302–05. It further obligated a judge or magistrate, upon receiving proof to his satisfaction that an individual was a fugitive slave, to issue a certificate constituting a sufficient warrant for his or her removal to the state or territory from which he or she fled. *Id.* The Act imposed civil penalties on individuals who obstructed or hindered the seizure or arrest of fugitive slaves and individuals who

rescued, harbored, or concealed fugitive slaves. *See* § 4, 1 Stat. at 305. Additionally, it created a right of private action for slave owners against persons who committed such acts. *See id.*

The rendition proceedings provided for individuals claimed as fugitive slaves under the 1793 Act were summary proceedings. During these proceedings, criminal procedural protections did not apply. The lack of due process afforded during the rendition proceedings under the Act created many opportunities for unscrupulous bounty-hunters to kidnap "the occasional free black who was likely to fetch a good price in the south." Robert R. Dykstra, *Bright Radical Star: Black Freedom and White Supremacy on the Hawkeye Frontier* 89 (1993) [hereinafter Dykstra]. To commence the summary rendition process, an individual claiming to be a slave owner or his agent needed only a southern-judge-signed affidavit. *See* Lee Kovarsky, *Habeas Verité*, 47 Tulsa L. Rev. 13, 16 (2011). The Act created no penalties for false claims. Jeffrey M. Schmitt, *Immigration Enforcement Reform: Learning from the History of Fugitive Slave Rendition*, 103 Geo. L.J. Online 1, 2 (2013) [hereinafter Schmitt].

The 1793 Act was construed to give "substantial independent responsibility to state judicial systems for adjudicating issues arising in connection with the rendition of escaped slaves." James A. Gardner, *State Courts As Agents of Federalism: Power and Interpretation in State Constitutional Law*, 44 Wm. & Mary L. Rev. 1725, 1787 (2003) [hereinafter Gardner]. Occasionally, state courts in northern states that were unfriendly to the institution of slavery "exercised their independence in ways that impeded efforts of slave owners to recover escaped slaves." *Id.*

Nevertheless, the weak evidentiary standards sufficient to achieve lawful rendition under the 1793 Act gave rise to the kidnapping of free northern blacks through the antebellum period. Paul Finkelman, *Sorting Out* Prigg v. Pennsylvania, 24 Rutgers L.J. 605, 622–23 (1993) [hereinafter Finkelman]. State governments in many northern states, including Iowa, adopted "personal liberty laws" intended to protect free blacks from kidnapping. Dykstra, at 89; Finkelman, 24 Rutgers L.J. at 623; Schmitt, 103 Geo. L.J. Online at 3.

Following the passage of the 1793 Act, rendition controversies involving fugitive slaves and fugitives from justice continued to arise in the context of the broader dispute over slavery. *See* Lasch, 92 N.C. L. Rev. at 163. With respect to fugitives from justice, southern states refused to extradite individuals accused of kidnapping free blacks to the north, and northern states refused to extradite those accused of aiding and abetting fugitive slaves to the south. *Id.* at 180.

The northern states' ill-fated legislative efforts met their demise in 1842, when the United States Supreme Court considered the constitutionality of the 1793 Act and the constitutionality of a state statute effectively forbidding the seizure and recovery of fugitive slaves in *Prigg v. Pennsylvania*, 41 U.S. 539, 10 L. Ed. 1060 (1842). In *Prigg*, the Court concluded the Fugitive Slave Clause granted Congress exclusive power to legislate on the subject of fugitive slaves. 41 U.S. at 541–42, 617–18, 10 L. Ed. at 1061, 1090. Thus, the Court held unconstitutional "any state law or state regulation, which interrupts, limits, delays or postpones the right of the owner to the immediate possession of the slave, and the immediate command of his service and labor." *Id.* at 540, 612, 10 L. Ed. at 1061, 1088. In contrast, the Court upheld the provisions of the 1793 Act setting forth procedures for the rendition of

fugitive slaves to be constitutional, save for the provision compelling local magistrates to issue certificates authorizing the removal of fugitive slaves while acting in their official state judicial capacities. *Id.* at 582, 622, 10 L. Ed. at 1077, 1091. The Court invalidated the provision compelling local magistrates to act on the theory that Congress may not convey authority to exercise the federal judicial power to persons not holding federal government commissions. *Id.*

*Prigg* effectively invalidated all state legislation giving procedural protections to individuals claimed as fugitive slaves under the 1793 Act. Schmitt, 103 Geo. L.J. Online at 3. Paradoxically, *Prigg* virtually nullified the portion of the 1793 Act authorizing the removal of fugitive slaves from northern states. *See id.* at 4. Though *Prigg* rendered northern states unable to legislate procedural protections for individuals claimed as fugitive slaves at the state and local level, it also forbid Congress from compelling state cooperation in rendition proceedings under the Act. As a result, in the aftermath of *Prigg*, some northern states passed more robust "personal liberty laws" intended to end all state cooperation in the rendition of individuals claimed as fugitive slaves by barring state judges and law enforcement officers from any involvement therein. Lasch, 92 N.C. L. Rev. at 178; Schmitt, 103 Geo. L.J. Online at 3. In other northern states, state judges simply declined to hear rendition proceedings involving alleged fugitive slaves. Finkelman, 24 Rutgers L.J. at 664. The unintended consequence of *Prigg* was that without assistance from local state judges and local law enforcement, recovery of fugitive slaves became far more difficult. *See id.*; Schmitt, 103 Geo. L.J. Online at 4.

Congress responded to this state of affairs by passing an Act as part of the Compromise of 1850 to amend and supplement the 1793 Act.

Act of Sept. 18, 1850, ch. 60, 9 Stat. 462 (repealed 1864). In passing the 1850 Act, Congress sought to empower the federal government to enforce the fugitive slave law despite northern resistance. Schmitt, 103 Geo. L.J. Online at 4. The 1850 Act did not repeal any portion of the 1793 Act. Johnson, 31 Yale L.J. at 169–72. Instead, it created the vast federal infrastructure necessary to meet the demand for fugitive slave rendition proceedings by authorizing federal judges to appoint commissioners with authority to preside over those proceedings and issue certificates permitting the removal of individuals claimed as slaves. *See* §§ 1–4, 9 Stat. at 462. In addition, it made a marshal's refusal to receive or execute an arrest warrant for an alleged fugitive slave a crime punishable by a fine of one thousand dollars and subjected marshals to civil liability for the value of the labor of fugitive slaves who escaped from their custody. *See* § 5, 9 Stat. at 462–63. It further authorized commissioners to appoint persons to assist in the execution of arrest warrants and gave persons so authorized the power to summon bystanders to their aid. *Id.*

Besides creating the federal machinery necessary to implement fugitive slave rendition, the 1850 Act explicitly authorized slave owners and their agents to reclaim fugitive slaves by procuring arrest warrants or seizing and arresting them directly "without process." § 6, 9 Stat. at 463. Following arrest, an alleged fugitive slave was to be brought before a commissioner or judge whose duty was to "hear and determine the case . . . in a summary manner." *Id.* Upon receipt of "satisfactory proof," the commissioner or judge was to issue a certificate that would be "conclusive of the right" of the person in whose favor it was granted to remove the fugitive slave to the state or territory from whence he came and "prevent all molestation of such person . . . by any process issued by any court, judge, magistrate, or other person." § 6, 9 Stat, at 463–64. A

deposition transcript or affidavit duly authenticated by any court in the state or territory from which a fugitive slave allegedly escaped in which the claimant affirmed the identity of the alleged fugitive slave and affirmed that individual in fact owed him service or labor constituted "satisfactory proof" under the Act. § 6, 9 Stat. at 463. The 1850 Act expressly forbid the admission of testimony by alleged fugitive slaves into evidence in their own rendition proceedings. *Id.* It also provided that each commissioner charged with hearing rendition proceedings was to be paid a fee of ten dollars for each proceeding in which he granted a certificate authorizing the removal of a fugitive slave and five dollars for each proceeding in which he did not. § 8, 9 Stat. at 464. Finally, unlike the 1793 Act, the 1850 Act subjected any person who obstructed or hindered the arrest of a fugitive slave, aided or abetted the escape of a fugitive slave, or harbored or concealed a fugitive slave to civil *and* criminal liability, making such acts a crime punishable by a fine of one thousand dollars and six months' imprisonment and making persons who committed such acts liable to slave owners in civil debt proceedings. § 7, 9 Stat. at 464.

Following the passage of the 1850 Act, the fugitive slave law clearly had much sharper teeth. H. Robert Baker, *The Fugitive Slave Clause and the Antebellum Constitution*, 30 Law & Hist. Rev. 1133, 1163 (2012) [hereinafter Baker]. Indeed, it appeared to have been "drawn with diabolical ingenuity." Johnson, 31 Yale L.J. at 171. As one legal commentator noted, "The features which made this act so odious to men and women who abhorred human slavery strike one in the face." *Id.* The provisions in the Act severely curtailing the process available to individuals alleged to be fugitive slaves were particularly problematic:

> Even if an alleged fugitive slave claimed mistaken identity, he was forbidden to testify, and relegated to a summary juryless proceeding in which the magistrate would pocket ten dollars if he found for the slave catcher but only five dollars if he found for the black man.

Akhil Reed Amar, *The Supreme Court, 1999 Term—Foreward: The Document and the Doctrine*, 114 Harv. L. Rev. 26, 70 (2000) [hereinafter Amar].

During heavily attended public meetings in northern states, the amended fugitive slave law was broadly condemned as immoral and unconstitutional. Baker, 30 Law & Hist. Rev. at 1165. Because it sharply curtailed the ability of northern states to provide "basic fair-trial rights, including an unbiased decision-maker" to alleged fugitive slaves, its passage also "heightened abolitionists' sensitivity to fair procedure." Elizabeth B. Wydra, *The Fourteenth Amendment's Due Process Clause and* Caperton*: Placing the Federalism Debate in Historical Context*, 60 Syracuse L. Rev. 239, 242 (2010). Although the amended fugitive slave law did not forbid individuals claimed as fugitive slaves from being represented by counsel during their summary rendition proceedings, it did not guarantee counsel for alleged slaves. Paul Finkelman, *Legal Ethics and Fugitive Slaves: The Anthony Burns Case, Judge Loring, and Abolitionist Attorneys*, 17 Cardozo L. Rev. 1793, 1804 (1996). Therefore, even though the summary proceedings provided for under the amended law were technically civil proceedings, several northern states provided appointed counsel to individuals claimed as fugitive slaves facing the prospect of rendition. Amar, 114 Harv. L. Rev. at 68 n.133; Robert A. Mikos, *Indemnification As an Alternative to Nullification*, 76 Mont. L. Rev. 57, 58–59, 59 n.9 (2015). Additionally, "states continued to pass personal liberty laws and, in some areas, state officials even actively

interfered with federal enforcement." Schmitt, 103 Geo. L.J. Online at 4.[25]

It was against the backdrop of this history that the framers of the Iowa Constitution debated the content of the guarantees to be afforded Iowans under article I, section 10 and the circumstances in which those guarantees ought to apply.

On the thirteenth day of the convention, the framers accepted a proposed amendment to the draft constitution adding the "cases" language to article I, section 10. 1 *The Debates*, at 201. Thereafter, as it appeared in the draft constitution the framers considered during the convention, the text of article I, section 10 provided,

> In all criminal prosecutions, and in all cases involving the life or liberty of an individual, the accused shall have the right to a speedy and public trial by an impartial jury, to be informed of the accusation against him, and have a copy of the same when demanded; to be confronted with the witnesses against him, to have compulsory process for his own witnesses, and to have the assistance of counsel.

*See id.*[26] More than two weeks later, on the thirty-first day of the convention, Mr. Amos Harris of Appanoose County moved to strike the "cases" language from article I, section 10. 2 *The Debates*, at 736. Specifically, Mr. Harris proposed striking the phrase "and in all cases involving the life or liberty of an individual" from article I, section 10,

---

[25]When a case involving interference with enforcement of the Act finally reached the Supreme Court in 1859, the Court summarily upheld the Act as constitutional in its entirety. *Ableman v. Booth*, 62 U.S. 506, 507, 526, 16 L. Ed. 169, 170, 177 (1858).

[26]We acknowledge the text appearing in article I, section 10 of the 1857 Iowa Constitution differed from that approved during the constitutional convention in two respects. *Compare* 2 *The Debates*, at 741, *with* Iowa Const. art. I, § 10 (1857). First, it did not contain the word "all" before the word "cases." Second, it included a comma after the word "life." The transcript of *The Debates* contains no explanation for these differences, as the vote rejecting the proposal to eliminate the phrase "and in all cases involving the life or liberty of an individual" from article I, section 10 was the last occasion on which the framers discussed article I, section 10 on the convention floor.

sparking a fiery debate among the framers as to the meaning and effect of that phrase. *Id.* at 736–41.

In support of his proposal to remove the "cases" language from article I, section 10, Mr. Harris stated his belief that its import would be "to give any person that may be arrested, who may be taken up in any shape or way in this state, the right of jury trial immediately, and in this state." *Id.* at 736. He then explained why providing persons who had "taken up" within the state the right to a jury trial within it would conflict with the United States Constitution. *Id.* With respect to fugitives from justice who committed a crime in another state and fled to Iowa, he argued the United States Constitution required such persons to be tried where the offense was committed. *Id.* With respect to individuals claimed as fugitive slaves who fled to Iowa, he asserted such persons could not have a jury trial within the State because state law "would prevent any person from proving their right to the labor of any person who might be a slave" as they would be unable to establish a property right in another person. *Id.*[27] Accordingly, Mr. Harris opined that providing fugitive slaves the right to a jury trial in Iowa "would be equivalent to saying at once, that any slave in the territory of this state shall have the right to assert his freedom, and cannot be remanded back into slavery." *Id.*

The first person to speak in favor of retaining the "cases" language was Mr. John Clark of Alamakee County. *Id.* at 737. Mr. Clark argued the United States Constitution already secured "to any individual who

---

[27]The Supreme Court of the Territory of Iowa, in its first reported case, had "refused to treat a human being as property to enforce a contract for slavery and held our laws must extend equal protection to persons of all races and conditions" in a habeas corpus action brought by a fugitive slave. *See Varnum v. Brien*, 763 N.W.2d 862, 877 (Iowa 2009) (discussing *In re Ralph*, 1 Morris 1, 9 (Iowa 1839)).

may be arrested under the laws of this State or under the jurisdiction of this State" all the rights that would be secured to him by the "cases" language in article I, section 10.  In his view, the federal constitutional provision stating no person shall be deprived of life, liberty, or property without due process of law already guaranteed that factual determinations implicating the liberty of alleged fugitive slaves would be made in common law courts.  *See id.*  But he asserted the "cases" language would have "no reference" to alleged fugitives from justice "being arrested in preparation for trial," arguing it would merely assure such an individual would not "be deprived of liberty . . . upon the trial which is to settle for all coming time the questions as to his right to liberty."  *Id.*  He asked, "Are not persons arrested every day for the purpose of examination, to ascertain whether there is proper cause for retaining them until they shall be put on final trial?"  *Id.*

Mr. Clark acknowledged the intent of the "cases" language was to prevent alleged fugitive slaves from having their fate summarily determined in another state without process.  During his passionate speech on the convention floor, he argued the "cases" language would secure trial rights essential to state sovereignty:

> Gentlemen will say perhaps that there is no danger of my being claimed as a fugitive slave.  I do not know whether there is not.  I apprehend that people as white as I am have been claimed as fugitive slaves.  And if I am found within the jurisdiction of this State, it is a principle of sovereignty, that if I am arraigned upon a charge that I do not own myself, that I am not a free man, I have the right to a trial here where I am found; and the laws of the State should guarantee to me that right.  We cannot be independent, we cannot be sovereign, without that right.  We cannot protect our citizens without it.  I do not care whether the case is probable or not.

*Id.* at 737–38. He also sought to illustrate the practical effect of providing only minimal procedural protections to individuals claimed as fugitive slaves under the amended fugitive slave law:

> Suppose that a man in Missouri comes over here and claims a horse, which he finds in my possession. He cannot dispossess me of that horse and take it to Missouri without giving me the benefit of a jury trial to ascertain whether that horse is mine or his. But if he wishes to put in a false claim to that horse, which he would be unwilling to submit to a jury of this State, where I have the means of proving that the property is mine, all he has to do is to go back to Missouri and make out a case describing me as a fugitive slave. Then he can take me, deprive me of my right of being heard by a jury, and thus secure me and my horse too!

*Id.* at 738. Unsurprisingly, he believed there were "serious doubts" as to the constitutionality of the fugitive slave law. *Id.* But he acknowledged that if the law *were* constitutional, "the higher law, the law of the United States," would prevail over article I, section 10. *Id.*

Next, Mr. James Wilson of Henry County spoke in favor of retaining the "cases" language in article I, section 10, arguing its application in the context of alleged fugitive slaves was vastly different than its application in the context of fugitives from justice. *Id.* at 738–39. According to Mr. Wilson, the reason an alleged fugitive from justice accused of committing a particular crime was to be delivered upon demand by the governor of the state in which the crime was committed was that only that state had jurisdiction to punish its commission. *Id.* at 739. In contrast, he pointed out, a charge alleging a person is a fugitive slave "is primary in its character, and is brought" wherever he or she is found. *Id.* In concluding, Mr. Wilson argued the "cases" language reflected important principles recognized by the founding fathers, stating,

> If there is anything in the government of the United States which has sprung up from the interpretation of the constitution, or which has grown out of the statutes of

Congress, with which the provision under consideration comes in conflict, then I say the sooner we get rid of it the better, the sooner we assert our determination to stand by the principles of the Fathers, the better for our country, the better for ourselves, the better for posterity.

*Id.*

Finally, Mr. J.C. Hall of Des Moines County spoke passionately in favor of striking the "cases" language from article I, section 10. *Id.* at 740. In particular, Mr. Hall argued those who sought to retain the "cases" language in article I, section 10 sought to exceed the limits of state sovereignty:

> In some things this State is sovereign; but in some things it is not sovereign. In some things the United States are sovereign, and in some things they are not sovereign. . . . Now, sir, as to this subject upon which this insidious clause is attempted to be engrafted into our Constitution, we, as a State, have said that the United States should be sovereign upon that question. . . . It is part of the Constitution of the United States. . . . Now, sir, the person who wishes to bring our State into collision with that instrument, or who wishes to put into our constitution a defiance against the exercise of that branch of sovereignty confided to the United States, and yielded to the United States by the Constitution, goes one step toward becoming a traitor to that instrument.
>
> . . . .
>
> . . . That government is supreme in regard to that question. The decisions of its courts are supreme with regard to it. We cannot interfere without collision and rebellion against that Constitution. Are we now to make our primary law come in conflict with that? . . . I do not believe that the majority of this convention can be brought into collision with the General Government upon that matter, or sow the seeds of treason in the constitution we are framing.

*Id.* at 740–41.

After Mr. Harris, Mr. Clark, Mr. Wilson, and Mr. Hall had each expressed their views concerning the effect of the phrase "in all cases involving the life or liberty of an individual" on the rights afforded by article I, section 10, the convention voted on the proposal to strike it

from the draft constitution. *Id.* at 741. The convention rejected that proposal and voted to retain the "cases" language by a vote of 21 to 14. *Id.*

When considered in historical context, we can infer much about the framers' intentions concerning the "cases" language appearing in article I, section 10 from their debate over its inclusion in the Iowa Constitution.

First, it appears clear that the primary concern of those who wished to strike the "cases" language from article I, section 10 was that its inclusion would cause the Iowa Constitution to conflict with federal law and the United States Constitution. *See id.* at 736, 740–41. To this concern, the framers who spoke in favor of retaining the "cases" language responded in myriad ways. In response to the assertion article I, section 10 would conflict with the fugitive slave law if it included the "cases" language, they contended the fugitive slave law was itself unconstitutional because it denied alleged fugitive slaves the rights secured to them under the United States Constitution. *Id.* at 737–39. As for the assertion that the "cases" language would cause our state constitution to conflict with the federal law governing the extradition of fugitives from justice, they argued the inclusion of the "cases" language would not secure article I, section 10 rights to individuals charged with crimes in other states or territories. *See id.* at 737, 739. In drawing that conclusion, they noted that under the fugitive slave law, as opposed to the law governing the extradition of fugitives from justice, the final

determination regarding an accused person's liberty was to be made in a proceeding occurring within the State. *See id.*[28]

Second, it is evident framers on both sides of the debate recognized the phrase "in all cases involving the life or liberty of an individual" was broad enough to apply in civil cases in which a final determination of an individual's liberty was to be made within the State. Whatever differences of opinion existed among the framers as to how best to interpret the "cases" language in article I, section 10, those differences by no means overshadowed the similarities. Rendition proceedings under the fugitive slave law were civil proceedings. Amar, 114 Harv. L. Rev. at 68 n.133. The law required any person who arrested an alleged fugitive slave to bring the arrested individual before a court, judge, or commissioner "of the proper circuit, district, or county, for the apprehension of such fugitive." *See* § 6, 9 Stat. at 463. It further required any commissioner or judge presiding over such a proceeding to issue a certificate conclusive of the individual's right to liberty upon presentation of a duly authenticated transcript or affidavit stating he or she owed service or labor. *See id.*; *see also* Johnson, 31 Yale L.J. at 170–71. Furthermore, a rendition proceeding constituted the only summary proceeding during which the liberty of an alleged fugitive slave was to be determined under the law—essentially an initial appearance and a proceeding on the merits rolled into one.

Third, there can be no dispute that the framers generally understood the "cases" language would extend article I, section 10 rights

---

[28]This case does not require us to determine whether an individual facing extradition from Iowa because he or she has been charged with a crime in another state has a right to counsel under any provision of the United States Constitution or the Iowa Constitution.

to criminal cases in addition to civil ones. The language the framers considered and voted to approve during the debates at the constitutional convention plainly referred to "*all* cases involving the life or liberty of an individual." 1 *The Debates*, at 201 (emphasis added); 2 *The Debates*, at 741 (emphasis added). The disagreement among the framers as to whether including the "cases" language in article I, section 10 would secure rights to fugitives from justice by no means suggests the framers disagreed concerning its plain meaning. At a minimum, cases involving the life of an individual include criminal prosecutions in which the death penalty is sought, and cases involving the liberty of an individual include those in which an individual's physical liberty is at stake by means of his or her arrest. That the framers debated the question of whether the "cases" language would extend article I, section 10 rights to fugitives from justice confirms that they believed its plain meaning was broad enough to extend those rights to criminal cases implicating the liberty of individuals accused of crimes at least in cases in which Iowa courts have jurisdiction to punish criminal conduct. *See* 2 *The Debates*, at 736–39. Hence, the subsequent vote of the convention to retain the "cases" language clearly signals the framers' intent to extend article I, section 10 rights to criminal cases involving the arrest of an individual.

Fourth, during the debates, the framers acknowledged that cases in which individuals have been arrested implicate physical liberty interests sufficient to trigger rights under the "cases" language of article I, section 10.[29] The fugitive slave law and the law governing the

---

[29]The "cases" language approved by the framers during the constitutional convention did not explicitly limit its import to cases implicating physical liberty. *See* 2 *The Debates*, at 741. Rather, the word "liberty" appearing in article I, section 10 is unqualified by any restricting terms, suggesting the framers likely intended it to be construed in its broadest sense. *See* Iowa Const. art. I, § 10. To decide this case,

extradition of fugitives from justice authorized the physical seizure and arrest of individuals claimed as fugitive slaves and individuals charged with committing crimes in other states and territories, respectively. *See* § 6, 9 Stat. at 463; § 1, 1 Stat. at 302. Though the framers did not unanimously agree as to whether the inclusion of the "cases" clause in article I, section 10 would secure rights to fugitives from justice who would ultimately be tried on criminal charges in other states, the framers implicitly agreed that its import was to secure article I, section 10 rights to all arrested persons facing a final determination of their rights under the jurisdiction of our state courts. *See* 2 *The Debates*, at 736–39. In fact, even Mr. Harris, who opposed the inclusion of the clause, argued its import would be to extend the reach of article I, section 10 to "any person that may be arrested, who may be taken up in any shape or way in this state." *Id.* at 736.

Fifth, the framers understood the inclusion of the phrase "in all cases involving the life or liberty of an individual" in article I, section 10 would extend rights thereunder beyond the formal initiation of judicial proceedings in qualifying cases involving liberty. *See id.* at 736–39. The first edition of Black's Law Dictionary indicated the term "case" historically was understood to be a "general term for an action, cause, suit, or controversy, at law or in equity." *Case*, Black's Law Dictionary (1st ed. 1891). It further described the term "cause" as generally referring not "to the *legal procedure* of a controversy" but "to its *merits* or

---

however, we need not decide whether article I, section 10 extends the right to counsel to cases involving other liberty interests. Notwithstanding that fact, we have previously recognized the Iowa Constitution contemplates other liberty interests, such as a parent's "fundamental liberty interest in childrearing." *Santi v. Santi,* 633 N.W.2d 312, 321 (Iowa 2001).

the *state of facts* involved." *Cause*, Black's Law Dictionary (emphasis added).

Importantly, the historical context in which the framers adopted the "cases" clause appearing in article I, section 10 yields additional insights into their intentions. In particular, history indicates the framers sought to assure that individuals involved in cases implicating their liberty had the ability to defend it effectively, not merely the right to be heard before a jury. By its terms, the fugitive slave law granted alleged fugitive slaves a statutory right to determinations as to their identity and whether they in fact owed service or labor. *See* § 6, 9 Stat. at 463. But such determinations were to be made immediately following their arrest during summary proceedings presided over by biased decision-makers in which procedural protections would be severely curtailed. *See id.* Even if the law had secured alleged fugitive slaves the right to have those determinations made by impartial juries, it is hard to imagine how an alleged fugitive slave might have secured his liberty during a summary proceeding in which he was barred from testifying in his own defense and lacked the ability to confront the person whose deposition testimony or affidavit was offered against him. *See id.* The rights to "assistance of counsel" and "compulsory process for his witnesses" could only have meaningfully assisted him in the context of a summary proceeding if they attached before that proceeding took place. *See* Iowa Const. art. I, § 10.

More fundamentally, as the plurality opinion recognizes, the "cases" clause of article I, section 10 was adopted, at least in part, to restore process stripped away by the fugitive slave law. Consequently, it is particularly relevant to its proper interpretation that the Iowa Constitution was adopted in the midst of the antebellum era. Though we now generally recognize the escalating tensions between the northern

and southern states had nearly reached their apex at that time, the framers of the Iowa Constitution lacked the benefit of hindsight in an uncertain age. Given their apparent motivations and the context in which those motivations arose, the framers surely did not intend the "cases" clause to be narrowly interpreted. As we have previously recognized, "the 'cases' language of article I, section 10 has broader application than the immediate problem it was designed to ameliorate." *Young*, 863 N.W.2d at 279.

When carrying out our fundamental and vital role to interpret the state constitutional guarantees invoked by individuals appearing before us, "we must never forget that it is a *constitution* we are expounding." *Varnum v. Brien*, 763 N.W.2d 862, 876 (Iowa 2009) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407, 4 L. Ed. 579, 602 (1819)). As we have previously recognized in the context of interpreting article I, section 10,

> unlike statutes, our constitution sets out broad general principles. A constitution is a living and vital instrument. Its very purpose is to endure for a long time and to meet conditions neither contemplated nor foreseeable at the time of its adoption.

*In re Johnson*, 257 N.W.2d 47, 50 (Iowa 1977). The framers of the Iowa Constitution created "a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs." Honorable Mark S. Cady, *A Pioneer's Constitution: How Iowa's Constitutional History Uniquely Shapes Our Pioneering Tradition in Recognizing Civil Rights and Civil Liberties*, 60 Drake L. Rev. 1133, 1148 (2012) (quoting *McCulloch*, 17 U.S. at 415, 4 L. Ed. at 579).

We have long recognized the plain meaning of the language in the "cases" clause of article I, section 10 suggests that it extends the rights

enumerated therein "beyond criminal prosecutions." *Johnson,* 257 N.W.2d at 53. We have also recognized its inclusion in article I, section 10 amounts to strong support for interpreting the right to counsel to apply not only to civil cases in which "liberty" interests are implicated, but also to criminal cases in which "liberty" is at stake. *Young,* 863 N.W.2d at 279. In light of the plain meaning of the language contained in the "cases" clause and the historical context in which it was adopted, it is time we recognized that the phrase "in cases involving the life, or liberty of an individual" in article I, section 10 extends the right to counsel under the Iowa Constitution at least to arrested individuals suspected of crimes with respect to which their guilt or innocence will be determined in a judicial proceeding under the jurisdiction of our state courts.

Our decision in *Ex parte Grace,* 12 Iowa 208 (1861), a case we decided just four years after the 1857 adoption of article I, section 10, reinforces my conclusion concerning the proper scope of the right to counsel afforded by the "cases" clause. In *Grace,* we held a civil statute authorizing supplementary proceedings in aid of execution violated article I, section 10. *Id.* at 211–12, 217. The statute authorized judges to find facts, order judgment debtors to deliver property in satisfaction of debts, and order the arrest and imprisonment of judgment debtors found guilty of contempt for failing to follow such orders. *Id.* at 211–12. In concluding the statute violated article I, section 10, we stated,

> It is claimed by counsel that the change in § 10, of the Bill of Rights, was only intended to meet the case of a fugitive slave. Whatever may have been the primary motive of some, or all of the members of the constitutional convention, in incorporating this provision, we can certainly see no reason in the nature of things, nor in the language employed, to justify the conclusion that white men were not also entitled to the benefit of it. We can not believe that it

> was intended to give the right of trial by jury to the occasional fugitive slave found in our State, and to withhold it in cases of equal magnitude and vital importance, from the half million of free white inhabitants of the State.

*Id.* at 213. The same analysis applies with respect to the right to counsel secured under article I, section 10 today when the State arrests an individual suspected of a crime who faces the prospect of a final determination as to his or her guilt or innocence.

For these reasons, I believe Senn's right to counsel attached when he was arrested for suspicion of driving under the influence in violation of Iowa Code section 321J.2, a serious misdemeanor. At that point, Senn faced a case involving his liberty within the meaning of article I, section 10. Thus, I now consider whether Senn faced a critical stage in the criminal process associated with his case when Officer Cuppy read him the implied-consent advisory and asked him to submit to a chemical test. If so, article I, section 10 guaranteed him the right to effective assistance of counsel.

When an individual suspected of driving under the influence submits to a chemical test that will determine his or her blood-alcohol concentration, that individual may be providing the government with "nearly conclusive evidence of a serious crime." *Missouri v. McNeely*, 569 U.S. ___, ___, 133 S. Ct. 1552, 1571, 185 L. Ed. 2d 696, 718 (2013) (Roberts, C.J., concurring in part, dissenting in part). In a prosecution for OWI under Iowa Code section 321J.2, the State may prove its case merely by showing beyond a reasonable doubt (1) that the defendant operated a motor vehicle (2) while having a blood-alcohol concentration of .08 or more. *See* Iowa Code § 321J.2(1)(*b*). To lawfully arrest an individual for OWI, an officer must have probable cause to believe each

element of the offense has occurred. *See State v. Lindeman*, 555 N.W.2d 693, 696 (Iowa 1996).

Often when an officer arrests an individual suspected of OWI, the officer has witnessed him or her operating a motor vehicle in an erratic fashion. Alternatively, the officer might have witnessed the individual engaging in other conduct suggesting his or her intoxication during a routine stop for a minor traffic violation. The point is that before an officer may lawfully arrest an individual for the offense of OWI, the officer must have probable cause to believe the individual was driving while in an intoxicated state. In other words, the officer must conclude the totality of the circumstances viewed by a reasonably prudent person would lead him or her to believe the individual drove a motor vehicle with the requisite degree of intoxication. The officer's testimony will ordinarily be sufficient to prove the first element of the State's case in a drunk-driving prosecution. Thus, the State will have effectively proven its case if the results of a chemical test to which the defendant submitted following arrest indicate the defendant had a blood-alcohol concentration of .08 or higher.

The United States Supreme Court's recent decisions addressing the admissibility of evidence obtained by officers invoking implied-consent procedures support the conclusion that an arrested individual deciding whether to submit to a chemical test after an officer administers an implied-consent advisory faces a critical stage of the criminal process under the Iowa Constitution. In *Missouri v. McNeely*, a driver arrested on suspicion of operating while intoxicated refused to provide a blood sample upon request after an officer administered a routine implied-consent advisory. ___ U.S. at ___, 133 S. Ct. at 1557, 185 L. Ed. 2d at

702–03 (majority opinion).[30] However, the officer ordered the driver's blood be drawn for chemical analysis without a warrant despite the driver's refusal to consent. *Id.* at ___, 133 S. Ct. at 1557, 185 L. Ed. 2d at 703. The Court framed the issue on appeal as one concerning the admissibility of a "nonconsensual" chemical test. *Id.* at ___, 133 S. Ct. at 1558, 185 L. Ed. 2d at 703–04. Five justices concluded the natural dissipation of alcohol in the bloodstream did not create a *per se* exigency to the warrant requirement and determined the existence of an exigency in the drunk-driving context "must be determined case by case based on the totality of the circumstances." *Id.* at ___, 133 S. Ct. at 1556, 185 L. Ed. 2d at 702. The five justices agreed that in "drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at ___, 133 S. Ct. at 1561, 185 L. Ed. 2d at 707. In the immediate wake of *McNeely*, numerous state courts concluded implied-consent schemes permitting warrantless blood draws from suspected drunk drivers in the absence of affirmative consent violate the Fourth Amendment. *See, e.g., State v. Butler*, 302 P.3d 609, 613 (Ariz. 2013) (en banc); *State v. Wulff*, 337 P.3d 575, 578, 582 (Idaho 2014); *Byars v. State*, 336 P.3d 939, 945–46 (Nev. 2014); *State v. Fierro*, 853 N.W.2d 235, 243 (S.D. 2014); *State v. Wells*, No. M2013-01145-CCA-R9-CD, 2014 WL

---

[30]The implied-consent advisory indicated that under state law the driver's refusal to submit would result in the immediate revocation of his driver's license for one year. *Id.* at ___, 133 S. Ct. at 1557, 185 L. Ed. 2d 702–03. In addition, a state statute provided any person who operated a vehicle on a public highway within the state was "deemed to have given consent to" a chemical test. Mo. Rev. Stat. §§ 577.020.1, .041 (2011). Like the statute in *McNeely*, the Iowa Code provides that implied consent to a chemical test exists whenever any person operates a motor vehicle under specified conditions anywhere within the State. *See* Iowa Code § 321J.6.

4977356, at *13 (Tenn. Crim. App. Oct. 6, 2014); *Weems v. State*, 434 S.W.3d 655, 665 (Tex. App. 2014), *aff'd*, ___ S.W.3d ___ (Tex. Crim. App. 2016) *petition for discretionary review granted* (Aug. 20, 2014); *see also State v. Declerck*, 317 P.3d 794, 804 (Kan. Ct. App. 2014), *review denied* (June 20, 2014).

Just three years after *McNeely*, the Court analyzed the admissibility of warrantless blood and breath tests administered on individuals arrested on suspicion of drunk driving as searches incident to arrest in *Birchfield v. North Dakota,* 579 U.S. ___, ___, ___ S. Ct. ___, ___, ___ L. Ed. 2d ___, ___ (2016). Ultimately, the Court determined the warrantless administration of a blood test to determine the blood-alcohol level of a person arrested for drunk driving violates the Fourth Amendment, but the warrantless administration of a breath test under the same circumstances is permissible as a search incident to arrest. *Id.* at ___, ___ S. Ct. at ___, ___ L. Ed. 2d at ___. Therefore, a state statute imposing a criminal penalty on an individual arrested on suspicion of drunk driving who refuses to submit to a warrantless breath test to determine his or her blood-alcohol level does not violate the United States Constitution, but a state statute imposing a criminal penalty for an individual's refusal to submit to a warrantless blood test following his or her arrest on suspicion of drunk driving is unconstitutional. *Id.* at ___, ___, ___ S. Ct. at ___, ___, ___ L. Ed. 2d at ___, ___.

The *McNeely* and *Birchfield* decisions illustrate that an individual seeking to understand the scope of his or her rights under the United States Constitution in the implied-consent context would almost certainly require the benefit of legal counsel in order to do so. The same observation surely applies to any individual questioning the scope of his or her rights in the implied-consent context under the Iowa Constitution.

Admittedly, when an officer invokes Iowa's implied-consent procedure and asks an individual who is under the influence to submit to chemical testing, that individual ultimately faces an adverse consequence, whether in the form of a criminal penalty or a civil penalty. *See* Iowa Code §§ 321J.2(2)–(7), .9(1)–(2). A first OWI offense is punishable by a minimum period of imprisonment for forty-eight hours with a total period of incarceration not to exceed one year or a deferred judgment with probation. *Id.* § 321J.2(3). A first refusal to submit to a chemical test results in the automatic revocation of one's license for a period of a year with eligibility to apply for a temporary restricted license after ninety days. *Id.* §§ 321J.9(1)(*a*), .20. Weighing the pros and cons of deciding between these two alternatives would be difficult for most people under the best of circumstances. To make the right decision, an individual suspected of OWI must quickly consider not only what the State can prove and what the likely penalty will be, but also what the future consequences might be for his or her occupation, family, and personal wellbeing. The decision is final, and it will determine both the range of criminal penalties the individual will face and the charge that will appear on his or her permanent criminal record. In these respects, the decision to submit or refuse to submit to a chemical test resembles the decision to plead to criminal charges.

For these reasons, I would conclude Senn faced a critical stage of the criminal process in the case against him when Officer Cuppy read him the implied-consent advisory and asked him to submit to a chemical test to determine his blood-alcohol concentration. Because I believe Senn was entitled to the assistance of counsel under article I, section 10 of the Iowa Constitution, I believe he was also entitled to effective assistance of counsel. *Williams,* 207 N.W.2d at 104. We previously

recognized that "if a criminal defendant is to receive the full benefits of the right to counsel, the confidence and privacy of communications with counsel must be assured." *Wemark v. State*, 602 N.W.2d 810, 816 (Iowa 1999). Accordingly, I conclude Senn was entitled to communicate with his attorney confidentially and privately under article I, section 10. *See Walker*, 804 N.W.2d at 293.

In my view, the plurality and concurring opinions fail to appreciate that the liberty interests of individuals who have been arrested and read implied-consent advisories are liberty interests the Iowa Constitution was clearly intended to protect. *See Grace*, 12 Iowa at 213. I would therefore reverse Senn's conviction. For these reasons, I respectfully dissent.

Hecht and Appel, JJ., join this dissent.

**APPEL, Justice (dissenting).**

I respectfully dissent from the result in this case.

**I. Factual Background.**

The material facts are straightforward and undisputed. Senn was stopped by police officer Brian Cuppy during the early morning hours of September 1, 2014. Cuppy initiated the stop because Senn failed to bring his vehicle to a stop in front of an intersection but came to a stop well past the crosswalk. After the stop, Cuppy believed Senn displayed signs of intoxication, administered field sobriety tests, and concluded that Senn might be under the influence of alcohol. Cuppy arrested Senn and took him to the police station for chemical testing.

At the station, Cuppy took Senn into a DataMaster breath alcohol testing room and read the implied-consent advisory to him. Cuppy also read Senn his rights under Iowa Code section 804.20. This Code provision provides, in relevant part,

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. . . . If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. . . . An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay.

Iowa Code § 804.20 (2013).

Senn invoked his right to call an attorney. Senn was able to reach his attorney and began talking with counsel. Officer Cuppy was a few feet away. Senn told Cuppy he wished to have "attorney–client" privilege, but Officer Cuppy stated Senn could not have that privilege while on the

phone call and could only do so if the attorney was there in person. Cuppy refused to allow Senn privacy in his conversation with his attorney. As a result, Senn and his attorney largely communicated through yes-or-no questions.

Senn requested his attorney come to the station to aid him in determining whether to submit to testing. Cuppy overheard that request and advised Senn that he only had thirty-two minutes left to have a private conversation with his lawyer. Senn continued to make potentially incriminating statements to his lawyer within earshot of Cuppy and the video recording device located in the room. Senn's lawyer told him that she could not meet with him within the prescribed time limit. Senn began an attempt to contact other lawyers but was unsuccessful.

Senn's consultation time expired, and Cuppy requested Senn submit to a breath test. He did so and provided a breath sample revealing a blood alcohol content of .140 percent. He was subsequently transported to the Polk County Jail. Senn was charged with first offense operating a motor vehicle while under the influence in violation of Iowa Code section 321J.2. Senn pled not guilty. He filed a motion to suppress the testing results. Among other things, he claimed the test result was obtained in violation of his right to have a private telephonic conference with his counsel.

The district court denied the motion to suppress. According to the district court, Senn's right to counsel had not attached as the officer was investigating a charge of operating a motor vehicle while intoxicated (OWI). The district court also noted that Cuppy never interrogated Senn. Senn was subsequently tried on the minutes and found guilty of OWI.

Senn appeals.

**II. Standard of Review.**

We review questions of constitutional interpretation de novo. *State v. Gaskins*, 866 N.W.2d 1, 5 (Iowa 2015); *State v. Baldon*, 829 N.W.2d 785, 789 (Iowa 2013); *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011).

**III. Attachment of Right to Counsel in "All Criminal Prosecutions" in Federal and State Courts.**

**A. United States Constitution: Functional vs. Formal Analysis.** The Sixth Amendment provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. As is often the case with constitutional provisions, the language is general and at least somewhat open-ended. Obviously, the provision must mean at the very least that there is a right to the assistance of counsel at trial.

But if the right to counsel is to mean anything, must it not apply beyond the trial itself? Does the constitutional right to counsel apply to ensure assistance that functionally suffices to protect defendants, or does it apply only in certain and specific formal proceedings? These are the questions posed in the famous Scottsboro case, *Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932). In *Powell*, lawyers were appointed on the day of trial to represent the defendants, but the Supreme Court found that such counsel was not sufficient. *Id.* at 56, 53 S. Ct. at 59, 77 L. Ed. at 164. Using a functional approach, the Supreme Court determined that if the right to counsel at trial was to have any meaning, there must be a right to pretrial counsel in order to assist in the preparation of a defense. *Id.* at 68–69, 53 S. Ct. at 64, 77 L. Ed. at 170–71. Although *Powell* relied on due process rather than the right to counsel, the functional analysis was unmistakable. *Id.* at 71, 53 S. Ct. at 65, 77 L. Ed. at 172; *see* Alan K. Austin, *The Pretrial Right to Counsel,*

26 Stan. L. Rev. 399, 400–02 (1974) [hereinafter Austin] (describing the functional approach to the right to counsel and tracing its origins to *Powell*).

The Court used a similar functional approach in *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964). In *Escobedo*, the Supreme Court considered a case where prior to indictment, a murder suspect was held and extensively questioned at the police station. *Id.* at 479, 84 S. Ct. at 1759, 12 L. Ed. 2d at 979. When his lawyer appeared at the police station, he was not allowed to see his client until the interrogation was complete. *Id.* at 480–81, 84 S. Ct. at 1759–60, 12 L. Ed. 2d at 979–80. During the interrogation, Escobedo made a number of incriminating statements to the police interrogators. *Id.* at 483, 84 S. Ct. at 1761, 12 L. Ed. 2d at 981.

*Escobeco* took a functional approach to the right to counsel. *Id.* at 486, 84 S. Ct. at 1762, 12 L. Ed. 2d at 983. "It would exalt form over substance to make the right to counsel, under these circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment. [The defendant] had, for all practical purposes, already been charged with murder." *Id.*

The Supreme Court continued to utilize a functional approach to the right to counsel in *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967). In *Wade*, the Supreme Court considered whether a defendant is entitled to counsel at a postindictment, pretrial lineup. *Id.* at 219–20, 87 S. Ct. at 1928, 18 L. Ed. 2d at 1153. The government in *Wade* asserted that the pretrial identification was "a mere preparatory step in the gathering of the prosecution's evidence." *Id.* at 227, 87 S. Ct. at 1932, 18 L. Ed. 2d at 1157–58.

The United States Supreme Court disagreed. *Id.* at 236–37, 87 S. Ct. at 1937, 18 L. Ed. 2d at 1162–63. The *Wade* Court emphasized that the right to counsel should extend to critical phases where the accused simply cannot effectively scrutinize evidence at trial. *Id.* at 227–28, 87 S. Ct. at 1932–33, 18 L. Ed. 2d at 1158. In *Wade,* the Supreme Court focused on the language of the Sixth Amendment providing "the assistance of counsel" for the defense. *Id.* at 224–25, 87 S. Ct. at 1931, 18 L. Ed. 2d at 1156. According to the Court, "The plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defence.'" *Id.* at 225, 87 S. Ct. at 1931, 18 L. Ed. 2d at 1156. Because there was the grave possibility of prejudice in a pretrial lineup which cannot be reconstructed at trial, the *Wade* Court concluded that such a lineup was a critical stage of the prosecution where the defendant is entitled to the assistance of counsel as much as at the trial itself. *Id.* at 228–32, 87 S. Ct. at 1933–35, 18 L. Ed. 2d at 1158–60.

As in *Escobedo,* the *Wade* Court rejected formalism. *See id.* at 226, 87 S. Ct. at 1931–32, 18 L. Ed. 2d at 1157 (stating that the right to counsel would be "a very hollow thing" if the state could conduct pretrial examinations absent defense counsel that would then assure conviction at trial, no matter what the defense did (quoting *Escobedo*, 378 U.S. at 487, 84 S. Ct. at 1763, 12 L. Ed. 2d at 984)). As noted by Justice Brennan, "the accused . . . need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Id.* at 226, 87 S. Ct. at 1932, 18 L. Ed. 2d at 1157. Justice Brennan further noted that the hazards are identical regardless of whether they occur before or after the formal initiation of the adversary proceeding. *Id.*

The test the *Wade* Court articled was "whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *Id.* at 227, 87 S. Ct. at 1932, 18 L. Ed. 2d at 1157.

In *Miranda v. Arizona*, the Supreme Court developed a test for attachment of rights under the Fifth Amendment. 384 U.S. 436, 439, 86 S. Ct. 1602, 1609, 16 L. Ed. 2d 694, 704 (1966). While *Escobedo* utilized a vague "focus" test, the *Miranda* court applied an objective standard of custodial interrogation. *See id.* at 467, 86 S. Ct. at 1624, 16 L. Ed. 2d at 719; Austin, 26 Stan. L. Rev. at 402. While the *Miranda* case emphasized the Fifth Amendment right against self-incrimination, it is clear that the court considered the right to counsel as key to protecting Fifth Amendment rights. *See* 384 U.S. at 510, 86 S. Ct. at 1646, 16 L. Ed. 2d at 744 (Harlan, J., dissenting) (suggesting that the majority's reliance on the Fifth Amendment was an optical illusion and that in fact the majority was really creating new rules derived from Sixth Amendment precedent); Austin, 26 Stan. L. Rev. at 403–04 (noting that the Sixth Amendment was barely discussed in *Miranda*).

A changed makeup in the members of the Supreme Court, however, began to undermine the functional approach and move toward a more formalistic approach to the right to counsel. In *Kirby v. Illinois*, the Supreme Court considered the question of when the right to counsel attaches. 406 U.S. 682, 688, 92 S. Ct. 1877, 1881, 32 L. Ed. 2d 411, 417 (1972) (plurality opinion). In that case, a plurality declined to extend the Sixth Amendment right to counsel prior to the initiation of judicial criminal proceedings. *Id.* at 690, 92 S. Ct. at 1882–83, 32 L. Ed. 2d at 418. The *Kirby* plurality emphasized that it did not regard the boundary

of the initiation of adversarial judicial criminal proceedings to be "a mere formalism." *Id.* at 689, 92 S. Ct. at 1882, 32 L. Ed. 2d at 417–18.

Justice Brennan dissented. *Id.* at 691, 92 S. Ct. at 1883, 32 L. Ed. 2d at 419 (Brennan, J., dissenting). He argued that the formal initiation of proceedings was an artificial date. *Id.* at 698–99, 92 S. Ct. at 1887, 32 L. Ed. 2d at 423. According to Justice Brennan, "identical hazards" exist from focused interrogations and lineups regardless of whether these interactions occur before or after the date of formal adversary proceedings. *Id.* at 697–98, 92 S. Ct. at 1886–87, 32 L. Ed. 2d at 423.

The movement away from the functional analysis of *Powell,* *Escobedo,* and *Wade* continued in *United States v. Gouveia,* 467 U.S. 180, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984). In *Gouveia,* the Supreme Court considered a claim of deprivation of the right to counsel brought by prisoners charged with the murder of another inmate who were all held in administrative segregation during the pendency of internal prison disciplinary proceedings. *Id.* at 182–83, 104 S. Ct. at 2294–95, 81 L. Ed. 2d at 150–51. The United States Ninth Circuit Court of Appeals held that the right to counsel attached at that time, making an analogy to speedy trial cases where the right to a speedy trial attached at the time of arrest. *Id.* at 185–86, 104 S. Ct. at 2295–96, 81 L. Ed. 2d at 152. The Supreme Court rejected the Ninth Circuit's approach. *Id.* at 192–93, 104 S. Ct. at 2300, 81 L. Ed. 2d at 157. The *Gouveia* majority emphasized that the right to counsel was triggered by adversary judicial proceedings, not the time of arrest. *Id.* at 187, 104 S. Ct. at 2297, 81 L. Ed. 2d at 153.

Justice Stevens, along with Justice Brennan, concurred in the result but emphasized that the court's new direction of analysis in right-

to-counsel cases did not foreclose the possibility that in some circumstances, the right could attach prior to formal initiation of judicial proceedings. *Id.* at 197–99, 104 S. Ct. at 2302–03, 81 L. Ed. 2d at 160–61 (Stevens, J., concurring). The concurrence emphasized the Court's prior precedents "do[] not foreclose the possibility that the right to counsel might under some circumstances attach prior to the formal initiation of judicial proceedings." *Id.* at 193, 104 S. Ct. at 2300, 81 L. Ed. 2d at 157. According to Justice Stevens, prior cases show that the Sixth Amendment does not turn on the formal initiation of proceedings but "rather on the nature of the confrontation between the authorities and the citizen." *Id.* at 195, 104 S. Ct. at 2301, 81 L. Ed. 2d at 159. Justice Stevens concurred because he did not think that administrative segregation in a prison, even under a functional test, triggered the right to counsel. *Id.* at 197, 104 S. Ct. at 2302, 81 L. Ed. 2d at 160. Justice Stevens's concurrence is consistent with *Miranda,* which stated that custodial interrogation was the "point [at which] our adversary system of criminal proceedings commences." *Miranda,* 384 U.S. at 477, 86 S. Ct. at 1629, 16 L. Ed. 2d at 725.

Finally, the court considered whether to fully adopt the formal approach in *Rothgery v. Gillespie County,* 554 U.S. 191, 128 S. Ct. 2578, 171 L. Ed. 2d 366 (2008). In *Rothgery,* a former criminal defendant brought an action asserting that the county violated his Sixth and Fourteenth Amendment rights by following a policy of denying appointed counsel to arrestees released from jail. *Id.* at 197, 128 S. Ct. at 2582–83, 171 L. Ed. 2d at 373. Rothgery appeared before a magistrate and was told of the formal accusation against him, but the public prosecutor was not aware of the initial proceeding or involved in the initial hearing. *Id.* at 197–98, 128 S. Ct. at 2583, 171 L. Ed. 2d at 374. The question was

whether Rothgery after his initial appearance was entitled to appointed counsel at state expense. *Id.* at 197, 128 S. Ct. at 2583, 171 L. Ed. 2d at 373.

The Supreme Court held that Rothgery was entitled to appointed counsel. *Id.* at 213, 128 S. Ct. at 2592, 171 L. Ed. 2d at 383. The *Rothgery* Court emphasized that after the filing of the accusation, a defendant is then faced with " 'the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law' that define his capacity and control his actual ability to defend himself" against the charge. *Id.* at 207, 128 S. Ct. at 2589, 171 L. Ed. 2d at 380 (quoting *Kirby*, 406 U.S. at 689, 92 S. Ct. at 1882, 32 L. Ed.2d at 418). Nonetheless, *Rothgery* emphasized that attachment occurs "when the government has used the judicial machinery to signal a commitment to prosecute." *Id.* at 211–12, 128 S. Ct. at 2591, 171 L. Ed. 2d at 382. "*Rothgery* represents a triumph of formalism over functionalism . . . ." *The Supreme Court, 2007 Term—Leading Cases*, 122 Harv. L. Rev. 276, 313 (2008).

**B. Concerns in Lower Federal Caselaw Regarding Bright-Line Attachment of Right to Counsel.**

1. *Introduction.* Lower federal courts, of course, are bound to follow United States Supreme Court precedents. *Jaffree v. Wallace*, 705 F.2d 1526, 1532 (11th Cir. 1983). Nonetheless, review of lower federal court precedents can fill in the gaps in Supreme Court precedent and illuminate important consequences in varied factual circumstances.

As a general proposition, lower federal courts, even after *Kirby* and *Gouveia*, remained divided on whether there could be exceptions to the bright-line rule. A number of cases from the United States Courts of Appeals for the First, Third, and Seventh Circuits seemed to recognize

the possibility that the right to counsel might attach at some point other than arraignment in at least some circumstances. *See Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 892 (3rd Cir. 1999) (noting that the right to counsel may attach earlier when "the accused is confronted, just as at trial, by the procedural system, or by his expert adversary, or by both" (quoting *Gouveia,* 467 U.S. at 189; 104 S. Ct. at 2298, 81 L. Ed. 2d at 155)); *Roberts v. Maine,* 48 F.3d 1287, 1291 (lst Cir. 1995) ("We recognize the possibility that the right to counsel might conceivably attach before any formal charges are made, or before an indictment or arraignment . . . ."); *United States v. Larkin,* 978 F.2d 964, 969 (7th Cir. 1992) (observing that the defendant "may rebut this presumption [that right to counsel did not attach at preindictment lineups] by demonstrating that, despite the absence of formal adversary judicial proceedings, 'the government had crossed the constitutionally significant divide from fact-finder to adversary' " (quoting *United States ex rel. Hall v. Lane,* 804 F.2d 79, 82 (7th Cir. 1986)); *see generally* James S. Montana, Jr. & John A. Galotto, *Right to Counsel: Courts Adhere to Bright-Line Limits,* Crim. Just., Summer 2001, at 4, 6, 8 (summarizing lower court interpretations of *Kirby* and *Gouveia*).

A review of lower federal courts indicates there was particular concern with the Supreme Court's inflexible bright-line approach to the attachment of the right to counsel in at least four contexts: plea bargaining, surreptitious interrogation, prefiling discovery, and prefiling lineups.[31]

---

[31]A number of state courts also, though following *Kirby*, expressed concern about application of the rule. For example, a Missouri appellate court noted that the bright-line approach in *Kirby* made little sense, noting that "[o]nce [the defendant] has been identified by the victim, pre-informational or post-informational, to a large extent

2. *Right to counsel in prefiling plea bargaining.*  A number of cases have expressed concern about the failure of the *Kirby* bright-line rule to provide for the assistance of counsel in cases in which the government engages in plea bargaining with an accused prior to the formal institution of judicial proceedings.

In *United States v. Sikora,* the United States Sixth Circuit Court of Appeals considered a case of a probationer who was suspected of continuing involvement with drugs.  635 F.2d 1175, 1176 (6th Cir. 1980) (Wiseman, J., concurring in part and dissenting in part).  A DEA agent stated that they had enough evidence to indict and convict him and that cooperation would be in his best interest.  *Id.*  Eventually, Sikora made incriminating statements during the conversation with authorities.  *Id.* The majority stated that no adversary proceedings had commenced against Sikora, and dismissed his appeal based on the admission of this evidence.  *Id.* at 1775 (majority opinion).

A partial dissent, however argued that the right to counsel attached when the DEA agent discussed a plea agreement with Sikora even though there had been no formal charges filed.  *Id.* at 1176 (Wiseman, J., concurring in part and dissenting in part).  The dissent emphasized that "[t]here should be no cause for alarm at the prospect of potential criminal defendants enjoying Sixth Amendment rights during plea negotiations."  *Id.* at 1180.  The dissent focused on language in *Kirby* and emphasized that under the facts of the case, "the government ha[d] committed itself to prosecute" and that "the adverse positions of the parties ha[d] solidified."  *Id.* at 1181.

---

he has had his trial." *State v. Gray,* 503 S.W.2d 457, 460 (Mo. Ct. App. 1973); *see* Note, *The State Responses to* Kirby v. United States, 1975 Wash. U. L. Q. 423, 436–41.

The approach of the dissent was followed in the post-*Kirby* case of *Chrisco v. Shafran*, 507 F. Supp. 1312 (D. Del. 1981). In *Chrisco*, the district court found a right to counsel prior to the initiation of judicial proceedings where the government engaged in prefiling plea bargaining with the defendant. *Id.* at 1319. According to the district court,

> [T]he fact that the government is willing to engage in plea bargaining is proof that the government has made a commitment to prosecute and that the adverse positions of the government and the defendant have solidified in much the same manner as when formal charges are brought. . . . Recognizing the important role played by counsel in plea bargaining, I conclude that there can be factual contexts in which the [S]ixth [A]mendment right to counsel attaches prior to the time formal criminal charges have been filed.

*Id.* On the facts, however, the court declined to find a right-to-counsel violation because the events leading up to Chrisco's statements were "not true plea negotiations." *Id.*

The Sixth Circuit returned to the issue of prefiling plea bargaining in a postconviction action. *United States v. Moody*, 206 F.3d 609, 610, 612 (6th Cir. 2000). Moody claimed that he received ineffective assistance of counsel when his lawyer failed to properly advise him about a plea agreement offered by the government prior to the initiation of formal charges. *Id.* at 611–12. The government argued that there was no ineffective assistance of counsel because Moody's right to counsel had not attached. *Id.* at 612. In the postconviction action, the district court below reversed, finding that the Sixth Amendment had attached. *Id.*

In *Moody*, the Sixth Circuit stated that the United States Supreme Court's decision in *Gouveia* "foreclose[s] the possibility that the right to counsel might under some circumstances attach prior to the formal initiation of judicial proceedings." *Id.* at 613 (quoting *Gouveia*, 467 U.S. at 193, 104 S. Ct. at 2300, 81 L. Ed. 2d at 157 (Stevens, J., concurring)).

The Sixth Circuit recognized that Moody was faced "with an expert prosecutorial adversary" who was clearly committed "to proceed with prosecution." *Id.* at 614. The *Moody* court emphasized that it was "a triumph of the letter over the spirit of the law to hold that Moody had no right to counsel . . . only because the government had not yet filed formal charges." *Id.* at 616. Yet in light of the Sixth Circuit's reading of Supreme Court precedent, the court, with obvious regret, found no right to counsel. *Id.* In a concurring opinion, Judge Wisemen urged the Supreme Court "to reconsider its bright line test for attachment of the Sixth Amendment right to counsel." *Id.* at 618 (Wiseman, J., concurring). The Sixth Circuit has continued to express reservations regarding the Supreme Court's bright-line approach. *See Kennedy v. United States*, 756 F.3d 492, 494 (6th Cir. 2014); *see also* United *States v. Wilson*, 719 F. Supp. 2d 1260, 1268 (D. Or. 2010) ("Depriving a suspect-defendant of the effective assistance of counsel at pre-indictment plea negotiation . . . may be more damaging than a denial of effective assistance at trial itself.").

It seems to me that the prefiling plea bargain cases demonstrate either that *Kirby*'s bright line is either drawn in the wrong place or, alternatively, there must be exceptions to the bright-line rule to avoid sunburn when justice so requires.

3. *Right to counsel for pretrial* Massiah *violations.* Federal courts have occasionally shown discomfort with the bright-line approach of *Kirby* in the context of *Massiah*[32] violations. In *DeAngelo v. Wainwright,*

---

[32]*Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 1203, 12 L. Ed. 2d 246, 250 (1964) (holding that an indicted person released on bail was denied his Sixth Amendment rights when federal agents had deliberately elicited information from him in the absence of counsel).

the United States Eleventh Circuit Court of Appeals considered a prefiling situation where police secretly recorded the defendant's conversations. 781 F.2d 1516, 1517 (11th Cir. 1986). Although no accusatory pleading had been filed, the court, citing *Escobedo*, noted that part of the conversation recorded was accusatory in nature and was designed to coerce a confession. *Id.* at 1519. The *DeAngelo* court concluded that "[t]he conduct of the police in this case could qualify as an effort to circumvent DeAngelo's [S]ixth and [F]ifth [A]mendment rights after the police had decided to arrest him." *Id.* at 1520. As a result, the court reversed and remanded the case to the district court for further fact-finding on this point. *Id.*

*DeAngelo* raises an interesting question: if the right to counsel exists only after judicial action, can a defendant in custody be subject to deliberate efforts by government agents to circumvent the right to counsel found in *Massiah* and its progeny?

4. *Right to counsel at prefiling deposition.* A third case of interest is *United States v. Hayes*, 231 F.3d 663 (9th Cir. 2000) (en banc). By a 7–4 vote, the United States Court of Appeals for the Ninth Circuit concluded that the right to counsel did not attach even though the government had sought to obtain material witness depositions for use at defendant's trial. *Id.* at 667. The majority stated that it was "somewhat queasy because it looks like the government is trying to have its cake and eat it too." *Id.* at 675. The dissent attacked the majority for its "mechanical and formalistic approach," which was "inadequate to evaluate, let alone preserve, the constitutional values at stake." *Id.* at 680 (Reinhardt, J., dissenting). Although the analytic basis in the opinion is unclear, the court's discomfort with *Kirby* seems palpable.

5. *Right to counsel at prefiling lineup.* In *Hall,* the defendant was imprisoned and awaiting trial for a case when prison officials told him he was required to participate in a lineup for a second, unrelated case. 804 F.2d at 80. Hall sought but was not allowed to talk to his attorney before the lineup. *Id.* The witness identified Hall, and he was indicted, tried, and convicted. *Id.* In this habeas action, he challenged the failure of the state courts to suppress the identification as violating his right to counsel. *Id.*

The *Hall* court considered that a lineup is "fraught with the possibility of prejudice" and that the presence of counsel would be "a potent weapon in preventing prejudice." *Id.* at 81. The court, however, said that in order for the right to attach, Hall would have had to prove that it was a critical stage of the prosecution. *Id.* It explained that in its view, the Supreme Court had left open the question of what else may constitute the start of a *prosecution* sufficient to mark the attachment of the right of counsel. *Id.* at 82. The court declined, however, to find that a lineup would always cause the right to counsel to vest—rather, whether the right to counsel could attach would be a fact-specific inquiry into whether the role of the government had transformed "from fact-finder to adversary." *Id.* In other words, the *Hall* court said, whether formally or not, if the suspect in fact "become[s] the accused," then the right to counsel attaches. *Id.* at 83 (quoting *Escobedo*, 378 U.S. at 485, 84 S. Ct. at 1762, 12 L. Ed. 2d at 983). On the facts before it, the court concluded Hall had failed to show that the prosecution had in fact begun, and so the identification was admissible. *Id.*

**C. Caselaw from State Courts Regarding Attachment of Right to Counsel under State Constitutions.**

1. *Introduction.* It is axiomatic, of course, that states may adopt a different approach to the right to counsel under their state constitutions. Many state courts have thus departed from United States Supreme Court decisions in the area of right to counsel in a wide variety of settings. *See, e.g., Blue v. State,* 558 P.2d 636, 642 (Alaska 1977) (holding there is a right to counsel under Alaska Constitution in preindictment lineup absent exigent circumstances, contrary to *Kirby*); *In re Johnson,* 398 P.2d 420, 422 (Cal. 1965) (en banc) (noting under the California Constitution there is a right to counsel for all misdemeanor defendants); *State v. Antone,* 615 P.2d 101, 105 (Haw. 1980) (adopting a test for ineffective assistance more generous that *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)); *People v. McCauley,* 645 N.E.2d 923, 930, 933 (Ill. 1994) (holding that a suspect cannot knowingly waive their right to counsel if the state does not tell the suspect that their attorney is there and trying to reach the suspect); *State v. Lawson,* 297 P.3d 1164, 1169, 1173 (Kan. 2013) (rejecting *Montejo v. Louisiana,* 556 U.S. 778, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009), and holding that a defendant's uncounseled plea of guilty is invalid unless the defendant first waived the right to counsel knowingly and intelligently); *State v. Nordstrom,* 331 N.W.2d 901, 904–05 (Minn. 1983) (holding right to appointed counsel exists for all indigent misdemeanor defendants who *may* be imprisoned, not only those who actually are imprisoned); *see generally* Shirley S. Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law,* 63 Tex. L. Rev. 1141, 1190–93 (1985) (summarizing state courts' available avenues to depart from federal constitutional standards). We

also have departed from established United States Supreme Court precedent regarding the right to counsel recently in *State v. Young*, 863 N.W.2d 249, 257 (Iowa 2015).

There have been two analytically related but distinct approaches to dealing with the problems arising from the Supreme Court's bright-line approach. In some jurisdictions, courts have generally departed from arraignment as a bright line and instead move the line to another point, usually the point of arrest, which provides more generous protection of the right to counsel. In a number of other jurisdictions, the bright line may not be moved, but it is subject to certain exceptions where a rigid application of the bright-line approach simply does not make sense.

2. *Jurisdictions in which arrest generally triggers right to counsel.* Shortly after *Kirby* was decided, a number of state courts declined to apply the rule under their state constitutions. In *People v. Jackson*, the Michigan Supreme Court departed from *Kirby*. 217 N.W.2d 22, 27 (Mich. 1974), *overruled on other grounds by McDougall v. Schanz*, 597 N.W.2d 148 (Mich. 1999). The case involved photographic arrays and a lineup in an assault case. *Id.* at 23. *Jackson* relied on previous Michigan precedent noting that a suspect is entitled to counsel at a live or photographic lineup regardless of the judicial phase of prosecution. *Id.* at 27–28; *see* Neil Colman McCabe, *The Right to a Lawyer at a Lineup: Support from State Courts and Experimental Psychology*, 22 Ind. L. Rev. 905, 929–30 (1989) [hereinafter McCabe].

The Pennsylvania Supreme Court also refused to follow *Kirby*. In *Commonwealth v. Richman*, the Pennsylvania Supreme Court considered whether the right to counsel under the Pennsylvania Constitution was violated when a lineup was held after a warrantless arrest. 320 A.2d 351, 352–53 (Pa. 1974). The court concluded that "[t]o allow

uncounseled lineups between warrantless arrests and preliminary arraignment would only encourage abuse of the exigent circumstances exception and [undercut] our strong policy requiring warrants whenever feasible." *Id.* at 354. A concurring opinion by Justice Eagan directly attacked *Kirby.* *Id.* at 358 (Eagen, J., concurring). Justice Eagan declared,

> The artificial distinction drawn by the plurality in *Kirby*, between post-charge and pre-charge lineups is unwise and infringes upon the protections society should grant an accused. To force an accused to stand alone against the full force and investigative powers of organized society, until he is actually charged with the commission of the crime, is an outrageous injustice.

*Id.* at 361.

A result similar to *Richman* occurred in *Blue*, 558 P.2d at 641. In *Blue*, the Alaska Supreme Court noted that it was not limited by decisions of the United States Supreme Court when interpreting the Alaska Constitution. *Id.* Relying in part on Justice Brennan's dissent in *Kirby*, the *Blue* court found a right to counsel for persons in custody unless exigent circumstances prevent it. *Id.* at 643. The court ultimately found that under the facts of that case, exigent circumstances were in fact present. *Id.*; *see* McCabe, 22 Ind. L. Rev. at 930.

Finally, in *People v. Bustamante*, the California Supreme Court found a right to counsel in preindictment lineups. 634 P.2d 927, 935 (Cal. 1981) (en banc), *superseded on other grounds by constitutional amendment*, Cal. Const. art. I, § 28(f)(2). Relying upon previous California precedent that cited *Wade*, the court emphasized the unreliability of eyewitness identification and the extreme difficulty of reproducing the lineup procedure at trial. *Id.* at 933–34. As with Michigan and Alaska, the California court recognized that there could be

exigent circumstances that might justify proceeding without counsel. *Id.* at 935; *see* McCabe, 22 Ind. L. Rev. at 930–31.

In short, there is ample coherent and logical authority for rejecting the bright-line approach of *Kirby* under a state constitutional analysis.

3. *Cases in which right to counsel is afforded in the context of implied consent.* A number of other courts, however, have considered specifically the question of whether the right to counsel attaches in situations where a defendant is confronted with a request for a chemical test under an implied-consent statute. In these jurisdictions, there has not necessarily been a wholesale rejection of *Kirby*, but instead a recognition that the right to counsel may be present under some circumstances prior to the initiation of adversary judicial proceedings.

In one of the first cases, the New York Court of Appeals in 1968 considered whether the results of a chemical test were admissible after the denial of the defendant's request to telephone a lawyer. *People v. Gursey*, 239 N.E.2d 351, 352 (N.Y. 1968). In *Gursey*, the New York court held that the defendant was entitled to contact counsel unless it would unduly interfere with the investigation. *Id.* Since the requested phone call could have been handled in a matter of minutes, the court held that the right to counsel was violated in that case. *Id.* at 353; *see also People v. Rinaldi,* 436 N.Y.S.2d 156, 157 (N.Y. Town Ct. 1981).

The Vermont Supreme Court considered the question in *State v. Welch*, 376 A.2d 351, 352 (Vt. 1977). The court concluded that "the request to submit to a chemical test can rise to the level of a 'critical stage' in the proceedings." *Id.* at 355. The court recognized what it characterized as "a limited right to counsel." *Id.*; *see also State v. Welch*, 394 A.2d 1115, 1116–17 (Vt. 1978) (noting that the prior *Welch* case did not hold that a suspect must be advised of his right to counsel but only

that he must be allowed access to counsel if he requests it).  *Welch* has been cited with approval in other Vermont cases relating to driving-related chemical tests but not involving claims of violations of the right to counsel, and it has not been overruled.  *See State v. Bonvie*, 936 A.2d 1291, 1300 (Vt. 2007) (describing the virtue of flexible standards for chemical tests as articulated in *Welch*); *State v. Lund*, 475 A.2d 1055, 1058 (Vt. 1984), *overruled on other grounds by State v. Begins*, 531 A.2d 595 (Vt. 1987).

The Oregon Supreme Court considered the matter in the post-*Kirby* case of *State v. Spencer*, 750 P.2d 147, 147–48 (Or. 1988) (en banc).  The *Spencer* court declared that

> [a] person taken into formal custody by the police on a potentially criminal charge is confronted with the full legal power of the state, regardless of whether a formal charge has been filed.  Where such custody is complete, neither the lack of a selected charge nor the possibility that the police will think better of the entire matter changes the fact that the arrested person is, at that moment, ensnared in a "criminal prosecution."

*Id.* at 155–56.  The court recognized that the "evanescent nature of the evidence the police seek to obtain may justify substantially limiting the time in which the person may exercise his or her [state constitutional right to counsel], but it does not justify doing away with it."  *Id.* at 156; *see also State v. Durbin*, 63 P.3d 576, 579 (Or. 2003).  Further, in *State v. Dinsmore*, the Oregon Supreme Court noted that any telephone conversation should be private.  147 P.3d 1146, 1150 (Or. 2006); *see also State v. Riddle*, 941 P.2d 1079, 1082 (Or. Ct. App. 1997).

The Washington Supreme Court considered the right to counsel in the context of an OWI arrest in *State v. Fitzsimmons*, 610 P.2d 893, 895 (Wash. 1980) (en banc).  After analyzing various cases, including United States Supreme Court precedents cited above, the Washington Supreme

Court concluded that the defendant was entitled to the assistance of counsel before deciding whether to submit to a chemical test. *Id.* at 901. The court, however, seemed to refer generically to the right to counsel and did not clearly indicate whether the result in the case was based upon the United States Constitution or the Washington State Constitution. *See id.*

After the state sought certiorari, the Supreme Court vacated the decision and remanded the case. *Washington v. Fitzsimmons*, 449 U.S. 977, 101 S. Ct. 390, 66 L. Ed. 2d 240 (1980). The remand order asked the Washington Supreme Court to clarify the basis of the result in the case. *Id.* On remand, the Washington Supreme Court noted that its holding was grounded in state as well as federal constitutional principles. *State v. Fitzsimmons*, 620 P.2d 999, 1001 (Wash. 1980) (en banc). As a result, the court affirmed its prior opinion without change. *Id.*

The Minnesota Supreme Court confronted the issue of the right to counsel under the Minnesota Constitution in the context of a request for a chemical test in *Friedman v. Commissioner of Public Safety*, 473 N.W.2d 828, 829 (Minn. 1991). In *Friedman*, the defendant was pulled over from the road for suspected OWI. *Id.* The *Friedman* court emphasized that the civil label assigned to informed-consent statutes was not determinative. *Id.* at 832. According to the court, OWI and informed-consent penalties are inextricably intertwined with criminal penalties. *Id.* at 833. In any case, the quasi-criminal consequences of revocation were very important to an individual driver. *Id.* The court concluded "the Minnesota Constitution protects the individual's right to consult counsel when confronted with th[e] decision" to consent to a breath test. *Id.* at 833; *see State v. Schmidt*, 712 N.W.2d 530, 533 (Minn. 2006) (noting that *Friedman* established that the Minnesota Constitution grants

the right to counsel upon request when deciding to submit to chemical testing).

Many state courts, however, have found a right to counsel in the context of a request for informed consent based on statute or rule—not their underlying state constitutions. *See, e.g., Kameroff v. State*, 926 P.2d 1174, 1178 (Alaska Ct. App. 1996); *McNutt v. Superior Ct.*, 648 P.2d 122, 124 (Ariz. 1982) (en banc); *Kuntz v. State Highway Comm'r*, 405 N.W.2d 285, 289 (N.D. 1987); *Lakewood v. Waselenchuk*, 641 N.E.2d 767, 770 (Ohio Ct. App. 1994). Further, in jurisdictions in which the right to counsel attaches at the time of warrantless arrest, that right will also support the view that a person arrested and taken to the station for further testing is entitled to counsel. *See Richman*, 320 A.2d at 353.

**D. Iowa Caselaw on Attachment of Right to Counsel.** In a post-*Kirby* case, we applied the formalistic *Kirby* rule in *State v. Jackson*, 199 N.W.2d 102, 103 (Iowa 1972). In *Jackson*, the court applied the *Kirby* rule in the context of a pretrial identification. *Id.* There was no discussion of any claim under the Iowa Constitution. *See id.* In *State v. Vietor*, we recognized that there was a limited statutory right to the assistance of counsel. 261 N.W.2d 828, 831 (Iowa 1978); *see also Fuller v. State*, 275 N.W.2d 410, 411 (Iowa 1979). We did not find a violation of that limited statutory right in *Vietor*, however, based on the record then before us. 261 N.W.2d at 831.

Today's plurality characterizes *Vietor* as rejecting "the argument the right to counsel under the Sixth Amendment had attached when the arrestee was asked to submit to the breathalyzer test." This is not quite accurate. In *Vietor*, the defendant argued that his refusal to submit to the test should be inadmissible at trial because it violated his right to counsel under the Sixth Amendment. *Id.* at 830. We rejected this

argument because the implied-consent statute made the refusal to submit to the test admissible and we had previously upheld this as constitutional. *Id.* This does not mean that we found that the right to counsel had not attached, but merely that no rule of exclusion could be applied under the Sixth Amendment to prohibit the introduction of evidence related to the refusal. In any event, *Vietor* was a Sixth Amendment case. *Vietor* did not involve article I, section 10 of the Iowa Constitution, which is the focus of this present litigation. *See* 261 N.W.2d at 830.

**IV. Discussion.**

**A. Problems with the United States Supreme Court Bright-Line Attachment of Right to Counsel at Arraignment.** As logic and caselaw demonstrate, there are a significant number of problems with an ironclad application of the bright-line approach of the United States Supreme Court that make it unwise for Iowa to adopt it. We should either move the bright line to the point of arrest or recognize that there are going to be exceptions to the general rule.

At the outset, there is an odd inconsistency between Fifth and Sixth Amendment rights. Fifth Amendment rights are triggered during custodial interrogation, but Sixth Amendment rights are not. But the relationship between the individual and the state becomes adversarial during custodial interrogation, not just for Fifth Amendment rights, but for the right to counsel as well. At the point of custodial interrogation, there is a need for "a flow of information [to the individual] to help him calibrate his self-interest." Arnold H. Loewy, *The Supreme Court, Confessions, and Judicial Schizophrenia*, 44 San Diego L. Rev. 427, 428 (2007) (quoting *Colorado v. Spring*, 479 U.S. 564, 576, 107 S. Ct. 851, 859, 93 L. Ed. 2d 954, 967 (1987)). If the custodial atmosphere is

coercive for purposes of interrogation, why would it not be coercive in terms of providing informed consent? Does it not make sense, at a minimum, to move the generally applicable point of the right to counsel to the point of arrest?

Moreover, the bright line of federal law is highly formalistic and causes grave problems in some settings. It borders on the absurd to suggest that, for instance, a pretrial lineup after arrest but prior to arraignment does not require the presence of counsel, but the very same lineup occurring one day afterwards does. Justice Brennan made this very same point in his dissent in *Kirby* almost fifty years ago.[33] 406 U.S. at 699, 92 S. Ct. at 1887, 32 L. Ed. 2d at 423–24 (Brennan, J., dissenting). Yet, as noted by a leading commentator, the line drawn by *Kirby* "excluded most lineups from *Wade*'s protection, encouraged delay in the filing of charges, and drew a line that bore no rational relationship to the need for legal assistance." Albert W. Alschuler, *Failed Pragmatism: Reflections on the Burger Court*, 100 Harv. L. Rev. 1436, 1442 (1987).

Recent research on eyewitness identifications only tends to confirm how suggestive and potentially inaccurate early identifications cannot be undone by the time of trial.[34] Modern science now reinforces the notion

---

[33]Academic commentary after *Kirby* was largely unfavorable. *See* Joseph D. Grano, Kirby*, Biggers*, & Ash*: Do Any Constitutional Safeguards Remain Against the Danger of Convicting the Innocent?*, 72 Mich. L. Rev. 717, 725–30 (1974) (noting that *Kirby* created a new and previously unsupported limitation on the right to counsel); McCabe, 22 Ind. L. Rev. at 907 (describing how in light of *Kirby*, police can be expected to hold lineups prior to the initiation of formal adversarial proceedings in order to benefit from the absence of defense counsel).

[34]Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 Law & Hum. Behav. 1, 5–6 (2009); *see also* Kevin Krug, *The Relationship Between Confidence and Accuracy: Current Thoughts of the Literature and a New Area of Research*, 3 Applied Psychol. Crim. Just. 7, 17–31 (2007); Gary L. Wells, *Applied Eyewitness-Testimony Research: System Variables and Estimator Variables*, 36 J. Personality Soc. Psychol. 1546, 1548–55 (1978); Daniel B. Wright & Anne T. McDaid,

that if eye-witness identifications through lineups or similar methods are to be used, the presence of counsel is essential if the right to a fair trial is to be preserved.[35]

For example, since the 1970s, psychological research has identified several areas where procedural suggestiveness can subtly influence witnesses to identify the suspect—these problems include pre-lineup instructions, the composition of the lineup, and the behavior of the official administering the lineup, in addition to other problems. *See* Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 Law & Hum. Behav. 1, 1, 6 (2009). Identifying some of these subtle cues and problems can be impossible to do after the fact, as these can be ephemeral events not recorded in any way. *Id.* at 15–16. If the suspect has no right to counsel at these lineups, there will often be absolutely no indication that hidden suggestiveness has occurred, let alone proof sufficient to strike the identification. *Id.* at 16.

There is no way to estimate how often procedural suggestiveness leads to witness misidentification, but of the people who have been exonerated by new DNA evidence after their convictions, seventy-five percent of their cases involved one or more eyewitnesses misidentifying the innocent suspect. *Reevaluating Lineups: Why Witnesses Make Mistake and How to Reduce the Chance of a Misidentification*, Innocence

---

*Comparing System and Estimator Variables Using Data from Real Line-Ups*, 10 Applied Cognitive Psychol. 75, 75–81 (1996).

[35]In the alternative, at least one state supreme court has held that improperly structured identification procedures may be subject to challenge under the due process clause of the applicable state constitution. *See State v. Henderson*, 27 A.3d 872, 918–19, 919 n.10 (N.J. 2011).

Project (July 16, 2009), www.innocenceproject.org/reevaluating-lineups-why-witnesses-make-mistakes-and-how-to-reduce-the-chance-of-a-misidentification/. Decades of scientific research prove that the hazards of eyewitness identification described by the *Wade* Court as being beyond the ability of a suspect to detect are real. *Wade*, 388 U.S. at 228–32, 87 S. Ct. at 1933–35, 18 L. Ed. 2d at 1158–60. A defense counsel's presence at *any* lineup, whether it occurs prior to or after the initiation of formal proceedings against the defendant, is therefore vital to protect the defendant's right to a fair trial. *Cf. id.* at 235, 87 S. Ct. at 1936–37, 18 L. Ed. 2d at 1162 ("Thus in the present context, where so many variables and pitfalls exist, the first line of defense must be the prevention of unfairness and the lessening of the hazards of eyewitness identification at the lineup itself.").

Further, the rise of forty-eight-hour holds in other jurisdictions—where an arrestee is not subjected to judicial proceedings for up to forty-eight hours—demonstrates the potential flaws in stringent application of the bright-line approach in *Kirby*. Either the bright line must be moved to limit such irrationalities, or the bright line should be flexible enough to deal with situations where counsel is essential to preserve the trial rights of the defendant. Surely that is true in the case of informed consent, where once the client makes the decision, no lawyer, however skilled, can undo the consequences. The entire focus of *Wade* was protection of the right to a fair trial that can be irreparably affected by pretrial events. *See id.* The *DeAngelo* case highlights the possibility of manipulation and use of potentially inaccurate and uncounseled prefiling lineups to convict defendants. 781 F.2d at 1520.

A further example of the problems of rigid application of a bright-line rule may be seen in the prefiling plea bargaining cases of the Sixth

Circuit. Can the government enter into prefiling plea bargaining and cut a deal with a defendant without the assistance of counsel? That seems preposterous. Surely, if plea bargaining is going on, the adversarial positions have solidified and the state is likely represented by a trained professional. Yet in *Moody,* the court held such plea bargaining was permissible, but it expressed significant discomfort. 206 F.3d at 615–16. If there is to be a bright line of some kind, it simply cannot allow prefiling plea bargaining without the assistance of counsel. Either the bright line gets moved to accommodate prefiling plea bargaining, or there must be an exception to the bright line to prevent the travesty of uncounseled plea bargaining.

**B. Solid Footing of States Granting a Constitutional Right to Counsel in the Implied-Consent Context.**

1. *Overview of right to counsel.* In reviewing the caselaw, there is a solid footing for the proposition that prior to making a decision on informed consent, the defendant is constitutionally entitled to the assistance of counsel under the "all criminal prosecutions" language of article I, section 10. While the sanctions for refusal to consent are civil, informed consent laws are inextricably bound with criminal law. The crucial stage of the process is not really at trial, but at the police station when the accused is confronted with the request to submit to testing. The encounter between police and the arrestee at the police station is hardly a friendly chat over coffee. It is a coercive encounter, usually in the dead of night. It is not a stretch to suggest that in these circumstances, to protect his right to effective assistance at trial, an accused is entitled to the help of counsel in determining what the evidence at trial will be. The caselaw in Vermont, Minnesota, Oregon,

and Washington persuades me that the right to counsel should attach in this setting.

2. *Question of entitlement to a private attorney–client consultation in context of implied consent.* At this point, the real fighting issue in this case emerges. Does a driver facing an implied-consent request who invokes the right to call his lawyer have a right to engage in a discussion outside the earshot of the arresting deputy?

The Oregon Supreme Court has considered the question in two cases. In *Dinsmore*, the Oregon Supreme Court held that any telephone conversation between a person from whom implied consent is invoked and his attorney should be private. 147 P.3d at 1150. The court reached a similar result in *Durbin*, 63 P.3d at 579.

Similarly, in *State v. Powers*, the Vermont Supreme Court noted that where an OWI defendant's conversations were recorded, such a recording violated his statutory right to meaningful consultation with an attorney. 852 A.2d 605, 610 (Vt. 2004). Although the *Powers* case deals with a statutory right, the analysis of "meaningful consultation" with counsel would seem to have equal force in the constitutional context. *Id.* at 611.

Yet the Minnesota Supreme Court reached a contrary result in *Commissioner of Public Safety v. Campbell*, 494 N.W.2d 268, 270 (Minn. 1992). The Minnesota Supreme Court held that the telephonic right to legal advice before submitting to a chemical test need not be private. *Id.* According to the Minnesota Supreme Court, officers must be present in order to impeach any later testimony by an arrestee who submits to testing that ingestion of something at the station might have affected test results. *Id.* Further, the court noted that to the extent any conversation was overheard, the remedy was suppression. *Id.* at 269–70.

Here, the State raises a similar concern to that touched upon in *Campbell*, namely that there is a possibility that a suspect could claim ingestion of some substance while engaged in a private telephone conversation with an attorney. I do not buy the argument.

First, it would be an extraordinary story for a defendant to claim that he was not intoxicated prior to the arrest, but that after the arrest and prior to the chemical test, he or she ingested more drugs or alcohol to go over the legal limit. No party has cited, nor have we found through the miracle of computer-based research, any reported cases where the strategy has been attempted, let alone succeeded. In any event, the same risk occurs when a lawyer physically meets with the client at the station house, a setting where the attorney and client have a statutory right to confidential communication. Thus, the risk of ingestion of additional drugs or alcohol during a station-house visit by an attorney is the same as the risk that arises from a station-house phone call. There may, perhaps, be some circumstances where exigencies could require that a law enforcement officer be in the same room during an attorney–client conversation, but the burden would be on the State to show such an exigency. In this case, it failed to meet its burden.

**V. Overview of Attachment of Right to Counsel Under the "Cases" Provision of the Iowa Constitution.**

**A. Introduction.** The above analysis is based upon the "all criminal prosecutions" language in article I, section 10 of the Iowa Constitution. There is, however, an additional clause in the Iowa right-to-counsel provision not present in the federal counterpart. The "cases" clause plainly extends the right to counsel to matters beyond "criminal prosecutions."

**B. The "Cases" Clause of the Iowa Constitutional Right to Counsel.**

1. *Text.* Article I, section 10 of the Iowa Constitution provides, "In all criminal prosecution, *and in cases involving the life, or liberty of an individual* the accused shall have a right . . . to have the assistance of counsel." Iowa Const. art. I, § 10 (emphasis added). The Iowa constitutional text stands in contrast to the Sixth Amendment, which provides merely, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel . . . ."

The text of the federal right to counsel in the Sixth Amendment thus explicitly addresses only "criminal prosecutions," while the Iowa Constitution expansively provides a right to counsel in a category beyond criminal prosecutions. Because of this notable and material difference, federal cases that focus solely on criminal prosecutions plainly have limited utility in serving as a guide for our independent interpretation of the Iowa Constitution. In any event, federal authority is only a guide, even in interpreting similarly worded provisions of the Iowa Constitution.

2. *Historical background.* The historical materials related to the adoption of article I, section 10 of the Iowa Constitution are quite limited. Further, it is a dubious enterprise to consider what the founders of the Iowa Constitution of 1857 would have thought about the right to counsel in the context of DataMasters and the drunk driving of planes, trains, or automobiles. Nonetheless, a survey of historical materials might give us some clues about the constitutional values behind the right to counsel that must be applied in our modern-day context.

One thing we know for sure: the majority of the Iowa founders of the Constitution of 1857 were not lock-step devotees of federal authority. *See State v. Short,* 851 N.W.2d 474, 483 (Iowa 2014) ("[T]here is powerful

evidence that the Iowa constitutional generation did not believe that Iowa law should simply mirror federal court interpretations."). Indeed, we know that at the Constitutional Convention of 1857, great concern was expressed over fugitive slaves.[36] The founders, in direct defiance of the Federal Fugitive Slave Act, enacted a design to slow the rendition of fugitive slaves in Iowa by providing them with jury trials and attendant procedural protections. James F. Wilson, later to receive considerable attention as chairman of the House Judiciary Committee during Reconstruction, stated on the floor of the convention regarding the possibility of conflict between the state right-to-counsel provision and the Fugitive Slave Act, "Gentlemen may say that it will bring about a conflict between the courts of the United States and the courts of this State. Let that conflict come . . . ." 2 *The Debates of the Constitutional Convention of the State of Iowa* 739 (W. Blair Lord rep., 1857) [hereinafter *The*

---

[36]At the debates, George W. Ells stated, "I regard the Fugitive Slave Law as unconstitutional, because it does not give to man the right to defend his life and liberty by 'due process of law.'" 1 *The Debates of the Constitutional Convention of the State of Iowa* 101 (1857) [hereinafter *The Debates*], www.statelibraryofiowa.org/services/collections/law-library-iaconst. J. A. Parvin stated, "And this affords a good illustration of the evils growing out of the fugitive slave law, which the present democratic party would carry into every territory of the United States." 2 *The Debates* at 708. Rufus L. B. Clark stated, "It is a libel upon the English language to call [the Fugitive Slave Law] a law. . . . [The Fugitive Slave Law] will never be effectual until man obtains the power to repeal the laws of nature and of nature's God." *Id.* at 717. Amos Harris stated,

> [T]here is a provision in the constitution of the United States that provides for the return of . . . fugitive slaves . . . . This provision in our [state] constitution would prevent any person from being removed unless he first had a jury trial here. I undertake to say that he cannot have a jury trial here, for simple reasons. . . .
>
> . . . [This] would be equivalent to saying at once, that any slave in the territory of this state shall have the right to assert his freedom and cannot be remanded back into slavery.

*Id.* at 736.

*Debates*], www.statelibraryofiowa.org/services/collections/law-library/ iaconst.

So it appears that the founders were determined to provide a right to counsel for fugitive slaves. The United States Supreme Court was seen—correctly—as a tool of slavocracy, as demonstrated by the virtually unanimous and extraordinarily bitter denunciation by Iowa leaders of the *Dred Scott*[37] decision, which was handed down by the Supreme Court just a few months after the adjournment of the 1857 constitutional convention. *See* 1 *The Debates*, at 137 (showing the interest in *Scott* by the Iowa founders, who mentioned the then pending case during the debates); Anthony V. Baker, *"The Authors of All Our Troubles": The Press, the Supreme Court, and the Civil War*, 8 J.S. Legal Hist. 29, 48 (2000) (describing Northern reactions to the *Scott* decision). Not surprisingly, when South Carolina and Texas seceded from the United States, they cited Iowa as among the states that were asserting states' rights at the expense of federal power. *The Declaration of Causes of Seceding States: Primary Sources*, Civil War Trust, www.civilwar.org/education/history/ primarysources/declarationofcauses.html (last visited June 23, 2016).

The founders must have been well aware of the determined defense offered to fugitive slaves in Iowa, including the services of lawyers ready to represent the fugitives on a moment's notice. Paul Finkelman, *Fugitive Slaves, Midwestern Racial Tolerance, and the Value of "Justice Delayed"*, 78 Iowa L. Rev. 89, 122–28 (1992) (describing the efforts to help fugitive slaves by abolitionists in Iowa). Indeed, when word spread

---

[37] *Scott v. Sandford*, 60 U.S. 393, 15 L. Ed. 691 (1857) (holding in an infamous antebellum case that Dred Scott, who fled slavery in Missouri, could not sue for his freedom in Illinois), *superseded by constitutional amendment*, U.S. Const. amends. XIII, XIV.

of the seizure of a fugitive slave within Iowa's borders, competent counsel invariably appeared to attempt to defeat the odious act of rendition of a fugitive slave who enjoyed freedom within our borders pursuant to a hated federal law, the Fugitive Slave Act. *See id.* at 126 (describing one such hearing, where a lawyer appeared to represent the fugitive slaves).

Cases brought under the Fugitive Slave Act, of course, were not criminal matters. The founders clearly recognized that dramatic curtailment of life and liberty could also occur in civil proceedings such as actions under the Fugitive Slave Act.

There is nothing at all in the historical record, however, that suggests that the expanded language was limited to fugitive slaves. Indeed, textualists would have to concede that if the drafters' purposes were to limit the expansion of the right to counsel to fugitive slaves, they would have used narrow language making that proposition explicit. To limit the broad language utilized amounts to amending the Iowa Constitution to meet contemporary policy goals.

As was noted many years ago by Justice Marshall in *McCulloch v. Maryland*, a constitution provides "great outlines," and "we must never forget that it is a *constitution* we are expounding." 17 U.S. (4 Wheat) 316, 407, 4 L. Ed. 579, 601–02 (1819). We have expressed similar views. In interpreting provisions of the Iowa Constitution, we should consider the words of Justice LeGrand some years ago:

> [A] constitution is to be liberally construed, the principle has been developed that in framing a constitution, words are employed in a comprehensive sense as expression of general ideas rather than of finer shades of thought or of narrow distinctions, and ordinarily words in an instrument like the United States Constitution do not have a narrow, contracted meaning, but are presumed to have been used in a broad sense, with a view of covering all contingencies. . . . Stated differently, the rule is that no forced, unnatural, narrow, or

technical construction should ever [be] placed upon the language of a constitution.

*Redmond v. Carter*, 247 N.W.2d 268, 275 (Iowa 1976) (LeGrand, J., concurring specially) (quoting 16 Am. Jur. 2d *Constitutional Law* § 76, at 258 (1964)).  As we unanimously declared recently in *Gansen v. Gansen*, "It is well established that a broadly framed constitutional provision should not be narrowly interpreted in a fashion that limits its application to the specific mischief at hand."  874 N.W.2d 617, 626 (Iowa 2016); *see also State v. Newsom*, 414 N.W.2d 354, 359 (Iowa 1987) (stating we broadly construe article I, section 10 of the Iowa Constitution "to effectuate its purpose").

It would be odd to generously interpret the open-ended language of an Iowa constitutional provision related to agricultural leases while narrowly construing open-ended Iowa constitutional provisions related to the right to counsel.  Indeed, constitutional interpretation involves taking general commands and applying them to specific cases, not using specific cases to narrow the scope of general commands.  Further, as noted by the Supreme Court in *United States v. Ash*, the expansion of the right to counsel is necessary "when new contexts appear presenting the same dangers that gave birth initially to the right itself."  413 U.S. 300, 311, 93 S. Ct. 2568, 2574, 37 L. Ed. 2d 619, 627 (1973).

Because of the differences in text, it strains credulity to suggest that the "cases" clause is simply a redundant passage and that the federal caselaw under the "all criminal prosecutions" clause of the Sixth Amendment is applicable.  Further, the effort to limit the extra verbiage in article I, section 10 to the matters of the Fugitive Slave Act is contrary to broadly accepted standards of constitutional interpretation that have been embraced time and time again.

In fact, the fugitive-slave hypothetical is just an example of how the Iowa Constitution is different from the Federal Constitution when it comes to the right to counsel. Fugitive-slave cases were civil matters akin to extradition. Yet under the prevailing interpretation of the "all prosecutions" clause of the Sixth Amendment, such civil matters do not give rise to a right to counsel. *Judd v. Vose*, 813 F.2d 494, 497 (lst Cir. 1987) (holding no right to a counsel attaches at an extradition hearing); *McDonald v. Burrows*, 731 F.2d 294, 297 (5th Cir. 1984) (noting extradition is not a criminal proceeding, and so Sixth Amendment rights not implicated); *Caltagirone v. Grant*, 629 F.2d 739, 748 n.19 (2nd Cir. 1980) (noting that the Sixth Amendment applies only to criminal prosecutions and therefore not to an extradition); *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (lst Cir. 1978) (holding no right to a speedy trial at extradition proceedings); *Dunkin v. Lamb*, 500 F. Supp. 184, 187 (D. Nev. 1980) (noting extradition is not a critical stage of a criminal proceeding).

Further, under the Iowa Constitution, basic rights are "inalienable." Iowa Const. art. I, § 1. Such language is wholly absent from the Federal Constitution. The inclusion of this strong inalienability language is consistent with our state motto: "Our liberties we prize, and our rights we will maintain." Neither the motto nor article I, section 1, has a qualifier that the rights are applicable "to the extent convenient."

It seems to me, aside from the analysis of the "all criminal prosecutions" language, the "cases" clause provides ample footing for a right to counsel when implied consent is invoked. In this case, the suspect faces a critical stage that will dramatically affect the subsequent criminal trial and could well lead to revocation of his driver's license for an extended period of time. A lawyer will be of little help once the die is

cast at the time of the request for a chemical test. As a result, Senn is entitled to counsel under article I, section 10 of the Iowa Constitution.

## VI. Conclusion.

For the above reasons, I would conclude that a right to counsel under article I, section 10 of the Iowa Constitution attaches when a suspect is confronted with an implied-consent request and that the request for a chemical test is a "critical stage" of the case. The opportunity to consult with counsel must be confidential absent a showing of exigent circumstance. That right, of course, is time limited so as to not impair the ability of the State to conduct appropriate testing upon consent. The refusal of the officer in this case to allow for a confidential communication requires suppression of the evidence in question.

Therefore, I would reverse.

Wiggins and Hecht, JJ., join this dissent.